## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

SERVICE WOMEN'S ACTION )
NETWORK and VIETNAM )
VETERANS OF AMERICA, )
)
Petitioners, )
)
v. ) **PETITION FOR REVIEW**
)
ERIC K. SHINSEKI, )
Secretary of Veterans Affairs, )
)
Respondent. )
)

## INTRODUCTION

Widespread rape, sexual assault, and sexual harassment plague the

military, threatening the strength of the armed forces, undermining national

security, and destroying the lives of survivors and their families. Nearly one

in every three women is raped during her service and more than half

experience unwanted sexual contact. Moreover, of the 26,000 service

members who reported unwanted sexual contact in 2011-12, fifty-two

percent were men. These assaults often result in devastating, long-term

psychological injuries, most notably Post-Traumatic Stress Disorder

("PTSD"). Sexual violence correlates with PTSD more highly than any other

trauma, including combat.

After completing their service, many survivors of military sexual violence return home with severe physical and psychological disabilities only to confront homelessness, unemployment, isolation, and substance abuse. As a result, survivors seek care and support from the U.S. Department of Veterans Affairs ("VA"). One in five female veterans and one in one hundred male veterans seeking VA healthcare reports an experience of rape, sexual assault, or sexual harassment, which VA refers to collectively as military sexual trauma ("MST").

Like other veterans, MST survivors seek disability compensation from VA, most commonly for PTSD, in order to support themselves and their families while making up for earnings lost as a result of their injuries. To receive benefits, a veteran must prove that a current disability is related to military service, or "service-connection." Recognizing the difficulties of proving service-connection, VA has eased the evidentiary requirements for veterans with certain disabilities and diseases, including combat- and fear-related PTSD, herbicide exposure in Vietnam, and experience as a prisoner of war. For these veterans, service-connection is rightfully presumed.

MST survivors, however, are not afforded the same legal presumptions as other veterans, even though their service connection is often more difficult to prove. Instead, since VA often rejects lay testimony alone,

victims must present other corroborating evidence of their sexual trauma. Due to systemic under-reporting of in-service sexual trauma, most MST is not documented. Moreover, until December 2011, U.S. Department of Defense policy required restricted reports of MST to be destroyed after only five years, and sexual harassment reports after only two. Even when evidence is available, VA frequently fails to give it adequate weight. As a result, MST survivors are regularly unable to meet the heavy burden required to secure disability benefits. From 2009 to 2012, the annual grant rate for MST-related PTSD claims lagged behind the rate of other PTSD claims by 16.5 to 29.6 percentage points.

Years of informal advocacy have failed to persuade VA to end the disproportionate rejection of MST-related claims by adopting the same sort of evidentiary presumptions that it uses for other claims. As a result, petitioners Service Women's Action Network ("SWAN") and Vietnam Veterans of America ("VVA") submitted a formal petition for rulemaking in June 2013 (attached as Exhibit 1). The petition seeks to amend the evidentiary rule, 38 C.F.R. § 3.304, by creating a new subsection § 3.304(g), to provide the same sort of evidentiary presumption for MST-related PTSD as VA now applies to combat- and fear-related PTSD claims.

//

In their petition, SWAN and VVA challenged multiple aspects of VA's regulations. First, the stringency of VA's current evidentiary standard effectively bars many meritorious MST-related claims. Second, prior amendments did not eliminate gender discrimination or abuses of discretion in MST-related PTSD claims. Petitioners' proposed amendment to § 3.304 would ease the evidentiary burden and allow applicants to submit independent medical evaluations and diagnoses in a manner consistent with good medical practice. The proposed amendment would also alleviate the administrative backlog, expedite claims, and produce consistent and equitable results without regard to gender.

VA has ignored SWAN and VVA's petition since its submission in June 2013. Accordingly, Petitioners now have no choice but to seek this Court's intervention.

First, SWAN and VVA petition this Court to review the failure to respond to their rulemaking petition. VA's failure to respond violates the Administrative Procedure Act ("APA"), which requires an agency to conclude a matter before it within a "reasonable time." 5 U.S.C. § 555(b); *id.* § 706(1).

Second, to the extent VA's failure to act on the petition amounts to a constructive denial of the petition, then this denial violates the APA because

4

it is arbitrary, capricious, an abuse of discretion, and unauthorized by law. 5

U.S.C. § 706(2).

Third, this constructive denial also constitutes discrimination on the

basis of gender, in violation of the equal protection component of the Fifth

Amendment Due Process Clause. U.S. Const. amend. V. The absence of an

evidentiary presumption in § 3.304(f) for veterans seeking disability benefits

for MST-related PTSD discriminates against both women and men on the

basis of gender. Sexual violence in the military is suffered disproportionately

by women, who seek benefits for the resulting injuries at a higher rate than

men. VA includes numerous evidentiary presumptions for injuries incurred

in conflicts and roles from which women have been historically excluded,

including PTSD based on combat, but excludes a comparable presumption

for an injury suffered disproportionately by women, namely PTSD based on

sexual violence. This discriminatory treatment against women, based, in

part, on outdated and inaccurate stereotypes of women, violates equal

protection.

VA's failure to adopt the evidentiary presumption also discriminates

against men, as the VA grants benefits to men with MST-related PTSD

disabilities at an even lower rate than it does for women. In 2011, VA

granted nearly 49 percent of PTSD claims from female survivors, but only

5

37 percent of claims from male survivors. This discriminatory treatment of men on the basis of their gender also violates equal protection.

## JURISDICTION

The United States Court of Appeals for the Federal Circuit has exclusive jurisdiction to review the rules and regulations of the United States Department of Veterans Affairs. 38 U.S.C. § 502; Federal Circuit Rule 47.12.

## STANDING

SWAN and VVA submitted a petition for rulemaking in June 2013, to which VA has not responded. SWAN has organizational standing to compel a response, or in the alternative to obtain judicial review of VA's constructive denial, because VA has forced SWAN to divert scarce resources to address the VA failings detailed in the petition. This diversion of resources is an injury-in-fact. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-379 (1982). Co-petitioner Vietnam Veterans of America has organizational standing and also has associational standing on behalf of its members, including individuals denied MST-related disability benefits from VA and those presently seeking such benefits under VA's current unfair and discriminatory evidentiary regulations. *See Hunt v. Wash. State Apple Adver.*

*Com'n.* 432 U.S., 333, 343 (1977). *Institut Nat'l Des Appellations D'Origine v. Vintners Int'l Co., Inc.,* 958 F.2d 1574 (Fed. Cir. 1992); *Disabled American Veterans v. Gober,* 234 F.3d 682 (2000).

## CONCLUSION

SWAN and VVA are adversely affected and aggrieved by VA's failure to respond to, and constructive denial of, their rulemaking petition to amend § 3.304. Petitioners request that the Court hold VA's constructive denial unlawful, set it aside and compel the agency to undertake a rulemaking and enact the proposed rule within a reasonable period of time. In the alternative, petitioners request that the Court compel the Secretary to respond to Petitioners' Petition within thirty (30) days of this Court's order.

April 29, 2014                    Respectfully submitted,

Michael Wishnie, Supervising Attorney
Daniela Nogueira, Law Student Intern
Daniella Rohr, Law Student Intern
Joya Sonnenfeldt, Law Student Intern
Veterans Legal Services Clinic
Jerome Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432 - 4800

7

# Exhibit 1

PETITION FOR RULEMAKING TO

PROMULGATE REGULATIONS GOVERNING SERVICE-CONNECTION FOR

MENTAL HEALTH DISABILITIES RESULTING FROM MILITARY SEXUAL ASSAULT

SUBMITTED TO

THE UNITED STATES DEPARTMENT OF VETERANS AFFAIRS

JUNE 27, 2013

Service Women's Action Network and Vietnam Veterans of America

Petition for Rulemaking to the Department of Veteran's Affairs Regarding Service Connection for Mental Health Disabilities Resulting from Military Sexual Trauma

Table of Contents

I.      Introduction ............................................................................................................. 1

II.     Legal authority ....................................................................................................... 6

III.    Petitioners ............................................................................................................... 6

IV.     Background: Rape, sexual assault, and sexual harassment in the military ................... 7
        A.  Sexual assault and sexual harassment in the military is a pervasive and long-standing problem .............................................................................................. 9
        B.  Military sexual trauma can devastate a veteran's career, social and family networks, and physical and mental health ...................................................... 12
        C.  The military context intensifies harms associated with rape, sexual assault, and sexual harassment ................................................................................... 15
        D.  Care without compensation for survivors of military sexual trauma is insufficient ................................................................................................... 19

V.      Current rule ........................................................................................................... 20
        A.  Systemic underreporting deprives survivors of rape, sexual assault, and sexual harassment of the documentation necessary to corroborate their claims ........ 23
        B.  VA adjudicators often misapply the current evidentiary standard ................. 30
        C.  Despite repeated amendments, VA's current rules for PTSD related to military sexual trauma still allow for biased exercises of adjudicators' discretion ...................................................................................................... 38

VI.     Proposed rule ........................................................................................................ 42
        A.  The proposed rule acknowledges the inherent difficulty of proving the occurrence of the stressor with secondary evidence ...................................... 47
        B.  VA should accept diagnoses from licensed psychiatrists and psychologists when applying the proposed rule ................................................................. 50
        C.  The proposed rule is consistent with the DSM-IV and current medical research ........................................................................................................ 52
        D.  The proposed rule will alleviate administrative burdens on VA and expedite claims for all veterans ................................................................................... 53
        E.  The proposed rule will improve the consistency and equitable resolution of military sexual trauma claims ....................................................................... 56

VII.    Conclusion ............................................................................................................ 58

# I. Introduction

The Service Women's Action Network ("SWAN") and Vietnam Veterans of America ("VVA") petition the United States Department of Veterans Affairs ("VA") to initiate a rulemaking proceeding pursuant to the Administrative Procedures Act, 5 U.S.C. § 553, to promulgate regulations governing disability compensation for mental health conditions incurred or aggravated during military service as a result of military sexual trauma ("MST"). For decades, the Department of Defense ("DOD") and VA have been aware of the pervasiveness of rape, sexual assault, and sexual harassment in the military. Research shows that survivors of rape, sexual assault, and sexual harassment often develop devastating, long-term psychological disabilities. Rape is more strongly correlated with posttraumatic stress disorder ("PTSD") in survivors than any other trauma, including combat trauma. But under the current VA claims adjudication process, survivors of MST face frequently insurmountable evidentiary barriers when attempting to claim disability benefits for their mental health disorders, barriers that have been eliminated for veterans with combat-related mental health disorders. New regulations are necessary in light of decades of failed, informal attempts at VA to reform its adjudication of MST-related claims.

VA provides benefits to veterans who suffer ongoing disabilities as a result of injuries or conditions incurred or aggravated during their military service. To claim VA disability benefits, veterans must satisfy three requirements. They must show a medical diagnosis of a current disability; evidence that they incurred the underlying injury or condition during service; and the relationship between the in-service injury or disease and their current disability.[1] For claims for

---

[1] Caluza v. Brown, 7 Vet. App. 498, 506 (1995), *aff'd*, 78 F.3d 604 (Fed. Cir. 1996), *superseded by statute on other grounds*, Veterans Claims Assistance Act of 2000 ("VCAA"), Pub. L. No. 106-475, 114 Stat. 2096 (2000).

1

PTSD, the second element is rephrased as the need for "credible supporting evidence that the claimed in-service stressor occurred."[2] VA refers to disabilities that meet these requirements as "service connected."

The proposed regulations go to the second element of service connection—the proof of the occurrence of the in-service sexual trauma that caused or aggravated the service member's disability. Currently, 38 C.F.R. § 3.304(f)(5) governs how veterans may prove the in-service stressor for PTSD based on personal assault, a category that includes military sexual assault and sexual harassment. Under this regulation, veterans may corroborate an in-service assault by presenting records or statements from persons to whom they may have disclosed the assault, including law enforcement, physicians, family, or clergy. They can also present medical evidence, such as pregnancy tests or evidence of sexually transmitted infections, or evidence of behavioral changes following the assault. VA does not have to take this evidence at face value. The regulations allow VA to "submit any evidence that it receives to an appropriate medical or mental health professional for an opinion as to whether it indicates that a personal assault occurred."[3]

SWAN and VVA petition VA to amend 38 C.F.R. § 3.304 by creating a new subsection—§ 3.304(g)—directly addressing MST. The proposed amendment reads as follows:

§ 3.304 Direct service connection; wartime and peacetime

. . .

(g) Military sexual trauma. If a stressor claimed by a veteran is related to the veteran's reported experience of military sexual trauma and a psychiatrist or psychologist confirms that the claimed stressor is adequate to support a diagnosis of a mental health condition and that the veteran's symptoms are related to the claimed stressor, in the absence of clear and convincing evidence to the contrary, the veteran's lay testimony alone may establish the occurrence of the claimed in-service stressor.

---

[2] 38 C.F.R. § 3.304(f) (2012).
[3] *Id.* § 3.304(f)(5).

2

By adopting the proposed regulation, VA will acknowledge the unique consequences of sexual assault and harassment within the military. Military sexual trauma is a unique cause of service-connected disability because it is exceptionally difficult to document. Service members who experience MST are unlikely to report their attack—even less likely than civilians who experience sexual assault. As a result, they often lack contemporaneous documentation of the assault in their service records. They may also lack secondary evidence from medical clinics or from friends and family. Instead of recognizing these obstacles, the current regulations require survivors to present evidence that frequently does not exist. Because survivors of sexual assault and sexual harassment in the military cannot produce the necessary corroboration, VA adjudicators frequently dismiss their claims for service-connected disability compensation as non-credible or non-verifiable. Being told that their stories are implausible or uncorroborated can re-traumatize survivors of MST and undermine attempts to appeal the initial decision. The proposed regulatory change would allow veterans to establish service-connection by testifying to their experience of sexual assault or sexual harassment, confirmed by a doctor's medical diagnosis of the MST-related disability. This change will recognize the particular obstacles associated with proving service connection for MST-related claims and lead to a more fair and accurate evaluation of such claims.

VA has acknowledged, and corrected, similar problems for other groups whose in-service injuries are difficult to verify. Until a recent rule change, veterans suffering from PTSD as a result of non-combat experiences in war zones labored under similarly difficult evidentiary burdens. VA recognized the injustice of its standards and in 2010 promulgated new regulations relaxing the evidentiary requirements for veterans with PTSD based on fear of hostile military or terrorist activity. Under these new rules, a veteran's lay testimony along with a diagnosis from a

3

VA psychiatrist or psychologist of PTSD related to the veteran's claimed stressor may provide sufficient proof of the occurrence of the in-service stressor. Lauding VA for its actions, President Obama eloquently articulated the underlying dilemma faced by troops under the previous rule:

> [F]or years, many veterans with PTSD who have tried to seek benefits . . . have often found themselves stymied. They've been required to produce evidence proving that a specific event caused their PTSD. And that practice has kept the vast majority of those with PTSD who served in non-combat roles, but who still waged war, from getting the care they need.
> Well, I don't think our troops on the battlefield should have to take notes to keep for a claims application.[4]

President Obama's concerns apply with equal force to veterans suffering from PTSD as a result of military sexual trauma. Service members should not be expected to take notes in the middle of a sexual assault. They should not face evidentiary burdens that they cannot meet and adjudicators whom they cannot convince. Yet today, the word of a veteran attesting to her in-service sexual assault, even when accompanied by a medical diagnosis of PTSD related to that assault, does not carry the same weight as the word of a veteran attesting to his war-zone experiences.

The evidentiary burdens presently imposed on sexual-trauma survivors result in disproportionate denials of service connection. From fiscal years 2008 to 2010, only one out of every three PTSD claims based on military sexual trauma was granted service connection by VA, compared to over half of all other PTSD claims.[5] At least in part as a result of the divergent evidentiary burdens placed on MST survivors, women with PTSD are less likely to be able to

---

[4] President Obama, *Weekly Address: President Obama Announces Changes to Help Veterans with PTSD Receive the Benefits They Need*, White House Office of the Press Secretary, July 10, 2010, http://www.whitehouse.gov/the-press-office/weekly-address-president-obama-announces-changes-help-veterans-with-ptsd-receive-be.
[5] Data recently released by the VA suggests that a disparity in adjudication of MST-related PTSD claims as compared to other PTSD claims has persisted in FY2011 and FY2012, although the gap may have narrowed somewhat. See *infra* note 78.

4

prove service connection than men. In 2010, VA denied 49.8% of women's claims for service-connected disability compensation for PTSD, but only 37.7% of men's claims.[6] Given the documented prevalence of MST and its strong correlation with PTSD and other mental health conditions, these statistics confirm the urgent need to amend the current regulations. To quote the critique of two attorneys at the Board of Veterans' Appeals, "[t]he current regulation addresses victims of rape the same as victims of a bar fight."[7]

The proposed rule responds to these demonstrated deficiencies and provides survivors with a viable method to prove service connection. This need has been recognized elsewhere—in fact, the House of Representatives has called upon VA to amend its approach in its passage of the Ruth Moore Act, which is currently under committee review in the Senate.[8] By adopting the regulation, VA will reduce the disproportionately onerous burden faced by survivors of MST. Adopting the rule will also facilitate the accurate and timely processing of claims that impose a significant and unnecessary administrative burden on VA. Most importantly, it will help VA more fully realize its mission to provide care and compensation to all veterans with service-connected disabilities.

---

[6] U.S. Dep't of Veterans Affairs, Office of Inspector Gen., *Review of Combat Stress in Women Veterans Receiving VA Health Care and Disability Benefits* 65 (2010) [hereinafter *Review of Combat Stress in Women Veterans*].
[7] Brianne Ogilvie & Emily Tamlyn, *Coming Full Circle: How VBA Can Complement Recent Changes in DOD and VHA Policy Regarding Military Sexual Trauma*, 4 Veterans L. Rev. 1, 36 (2012), *available at* http://www.bva.va.gov/docs/VLR_VOL4/AuthorsCopies1-OgilvieAndTamlin.PDF.
[8] *See* Ruth Moore Act of 2013, H.R. 671, 113th Cong. (2013); S. 294, 113th Cong. (2013). The act expresses the "sense of Congress that the Secretary of Veterans Affairs should update and improve the regulations of the Department of Veterans Affairs with respect to military sexual trauma by—(1) ensuring that military sexual trauma is specified as an in-service stressor in determining the service-connection of post-traumatic stress disorder by including military sexual trauma as a stressor described in section 3.304(f)(3) of title 38, Code of Federal Regulations; and(2) recognizing the full range of physical and mental disabilities (including depression, anxiety, and other disabilities as indicated in the Diagnostic and Statistical Manual of Mental Disorders . . .) that can result from military sexual trauma." H.R. 671, 106th Cong. § 2(b) (2013).

## II.    Legal authority

The Secretary of Veterans Affairs has the authority to promulgate rules and regulations pertaining to veterans' claims for service-connected disability benefits. General authority can be found in 38 U.S.C. § 501(a), which grants the Secretary the authority to prescribe all necessary and appropriate regulations governing the veterans' benefits process. More specific authority can be found in 38 U.S.C. § 1154(a)(1), which authorizes the Secretary to promulgate rules requiring consideration of "the places, types, and circumstances of [a] veteran's service as shown by such veteran's service record, the official history of each organization in which such veteran served, such veteran's medical records, and all pertinent medical and lay evidence" when VA adjudicates claims for disability service connection.

## III.    Petitioners

SWAN is a human rights organization founded and led by women veterans. SWAN's mission is to transform military culture by securing equal opportunity and freedom to serve without discrimination, harassment, or assault, and to reform veterans' services to ensure high-quality health care and benefits for women veterans and their families. The organization endeavors to raise awareness of the endemic occurrence of rape, sexual assault, and sexual harassment in the military. Through legislative advocacy, legal action, and public outreach, SWAN seeks to promote reform on issues of military sexual assault and sexual harassment. In addition, SWAN provides peer support, counseling referrals, and legal referrals to both male and female veterans who have experienced sexual assault or sexual harassment.

VVA is a congressionally chartered veterans service organization dedicated to serving the needs of Vietnam veterans and their families. VVA's goals are to promote and support the full range of issues important to Vietnam veterans, to create a new identity for this generation of

6

veterans, and to change public perception of Vietnam veterans. To that end, VVA engages in public advocacy and legal action on issues including access to health care, full identification of and compensation for injuries and disabilities incurred in military service, and improved employment and educational opportunities for veterans. VVA is a membership organization, and some of its members have pending claims with VA seeking service-connected disability compensation for MST-related conditions.

## IV. Background: Rape, sexual assault, and sexual harassment in the military

Rape, sexual assault, and sexual harassment are serious and ongoing problems in the military. Both the incidents themselves and the often devastating aftereffects experienced by survivors are so common that VA recognizes the experience by a specialized name—Military Sexual Trauma. VA defines MST as "psychological trauma, which in the judgment of a mental health professional employed by the Department, resulted from a physical assault of a sexual nature, battery of a sexual nature, or sexual harassment which occurred while the veteran was serving on active duty or active duty for training."[9] Sexual harassment consists of "repeated, unsolicited verbal or physical contact of a sexual nature which is threatening in character."[10] Both male and female soldiers experience MST, although its prevalence is higher among service women. DOD estimates that 26,000 soldiers were sexually assaulted in fiscal year 2012.[11]

Experiences of sexual assault and sexual harassment can result in both immediate and long-term debilitating effects. Both male and female service members who experience traumatic

---

[9] 38 U.S.C. § 1720D (2006).
[10] *Id.*
[11] U.S. Dep't of Def., *Annual Report on Sexual Assault in the Military: Fiscal Year 2012*, at 12 (2013) [hereinafter *DOD Report 2012*], *available at* http://www.sapr.mil/media/pdf/reports/
FY12_DoD_SAPRO_Annual_Report_on_Sexual_Assault-VOLUME_ONE.pdf. This represents an increase of 37% from the 19,000 reports of unwanted sexual contact in fiscal year 2010. *Id.* at 13.

sexual assault and sexual harassment demonstrate higher incidences of psychiatric symptoms and poorer overall functioning than service members who did not experience MST.[12] Most studies to date have focused on the strong link between military sexual assault and PTSD, although correlation with other mental health conditions and certain physical conditions has also been demonstrated.[13]

Recent studies also support anecdotal evidence that sexual assault in the military context may be uniquely traumatizing, above and beyond the effects seen in civilian populations.[14] Unlike civilian survivors of sexual assault, service members often must live and work alongside their attackers in situations that can aggravate the traumatic effects of the assault. The vast majority of perpetrators are fellow service members: coworkers, supervisors, and higher-ranking officers.[15] Given the military's strict hierarchy and emphasis on unit cohesion, the attack is a dual betrayal, both interpersonal and institutional. Survivors often face social isolation, risk career stagnation or demotion, and in some cases have charges leveled against them for misconduct.

Although VA screens all veterans for MST and offers free healthcare, its service to veterans is incomplete without corresponding disability compensation. By failing to acknowledge service connection for disorders resulting from military sexual assault, VA leaves survivors without the resources needed to alleviate the severe consequences of MST on their

---

[12] Maureen Murdoch et al., *Functioning and Psychiatric Symptoms Among Military Men and Women Exposed to Sexual Stressors*, 172 Military Med. 718, 718, 722-724 (2007).
[13] *Id.* at 718.
[14] Alina Suris et al., *Mental Health, Quality of Life, and Health Functioning in Women Veterans: Differential Outcomes Associated with Military and Civilian Sexual Assault*, 22 J. Interpersonal Violence 179, 192-94 (2007).
[15] *DOD Report 2012*, *supra* note 11, at 60. In fiscal year 2012, 62% of unrestricted reports involved allegations of service member-on-service member sexual assaults. The actual percentage of service member-on-service member sexual assault is likely higher, as service members may be more inclined to choose restricted reporting when sexually assaulted by fellow service members, or choose not to report at all. (Restricted reports do not contain identifying details about the assailant and victim.)

8

physical and mental health, as well as the resources needed to mitigate the effects of MST on survivors' social and economic capacities.

## A. Sexual assault and sexual harassment in the military is a pervasive and long-standing problem

VA's screening program for veterans seeking healthcare found that 1 out of every 5 female veterans and 1 out of every 100 male veterans self-reported experiences of MST.[16] Estimates of the prevalence of rape in the military are as high as nearly 1 in every 3 service women enduring such an experience.[17] One study found the percent of service women victimized to be as high as 43% when attempted rape was included.[18] These numbers are superficially consistent with the rate of rape and sexual assault for women in the United States. A recent, exhaustive government study revealed that nearly 1 out of 5 women in the United States reported that they had experienced sexual assault.[19] However, when considered in light of the fact that military sexual trauma by definition occurs in-service—a limited period of a veteran's adult life rather than an overall lifetime—the prevalence of sexual assault in the military is even more pronounced.

According to DOD's most recent figures, 2,949 service members reported being sexually assaulted in fiscal year 2012.[20] DOD believes that this figure drastically underrepresents the number of sexual assaults in the military. It estimates that the actual number service members

---

[16] Dep't Veterans Affairs, *Military Sexual Trauma General Factsheet* 1 (2012) [hereinafter VA, *MST Factsheet*], *available at* www.mentalhealth.va.gov/docs/mst_general_factsheet.pdf.
[17] Anne G. Sadler et al., *Factors Associated with Women's Risk of Rape in the Military Environment*, 43 Amer. J. of Indus. Med. 262, 273 (2003), as amended by Anne G. Sadler et al. *Erratum: Factors Associated With Women's Risk of Rape in the Military Environment. Am J Ind Med 43:262–273, 2003*, 44 Amer. J. of Indus. Med. 110 (2003).
[18] Alan Fontana & Robert Rosenheck, *Focus on Women: Duty-Related and Sexual Stress in Etiology of PTSD Among Women Veterans Who Seek Treatment*, 49 Psychiatric Services 658, 658-62 (1998).
[19] Ctr. for Disease Control and Prevention, *The National Intimate Partner and Sexual Violence Survey: 2010 Summary Report* 1 (2011), *available at* http://www.cdc.gov/ViolencePrevention/pdf/NISVS_Report2010-a.pdf.
[20] *DOD Report 2012*, *supra* note 11, at 58.

9

experiencing unwanted sexual contact in fiscal year 2012 was 26,000, almost nine times the number of reported assaults.[21] VA estimates that over half a million veterans have experienced military sexual trauma.[22] Notably, sexual assaults in the military are often not isolated events—a 2003 study found that 37% of women veterans who reported being raped reported being raped at least twice, and 14% reported experiences of gang rape.[23]

Over the past two decades, DOD and other government agencies have come to recognize the pervasiveness of military sexual trauma and have outlined areas of reform. In 2005, DOD established its Sexual Assault Prevention and Response Office ("SAPRO") to provide a single point of authority on sexual assault policy and procedures. SAPRO submits an annual report to Congress on sexual assault and sexual harassment in the military. These actions, while admirable, have not effectively addressed issues of military sexual trauma. As recently as September 2011, the U.S. Government Accountability Office ("GAO") released a report criticizing DOD for inadequate oversight of sexual harassment.[24] The report highlighted that, in spite of DOD's long-standing policy of fostering an environment free of sexual harassment, 41% of service members—52% of women and 38% of men—believed that members of their units could "get away" with sexual harassment to some degree, even if it were reported.[25] Even if successful, efforts by DOD to eradicate sexual assault in the military cannot help the thousands

---

[21] *Id.* at 25.

[22] *Invisible Wounds: Examining the Disability Compensation Benefits Process for Victims of Military Sexual Trauma: Hearing Before the Subcomm. on Disability Assistance and Mem'l Affairs of the H. Comm. on Veterans' Affairs*, 112th Cong. (2012) [hereinafter 2012 Congressional Hearing] (statement of Jon Runyan, Chairman, Subcommittee on Disability Assistance and Memorial Affairs), *available at* http://veterans.house.gov/opening-statement/honorable-jon-runyan-chairman-0.

[23] Sadler, *supra* note 17, at 266.

[24] Gov't Accountability Office, *Preventing Sexual Harassment: DOD Needs Greater Leadership Commitment and an Oversight Framework* (2011) [hereinafter GAO, *Preventing Sexual Harassment*], *available at* http://www.gao.gov/assets/590/585344.pdf.

[25] *Id.* at 9.

of veterans who experienced sexual assault in service before DOD recognized the extent of the problem. It is up to VA to follow through on the nation's promises to its service members and provide service-connected disability benefits for those suffering the harmful effects of in-service sexual assault and sexual harassment.

Efforts to provide care and compensation for conditions resulting from military sexual trauma are all the more important given MST's particular impact on female service members. Sexual assault and sexual harassment disproportionately affect service women, who comprise a growing portion of service members. Currently, 15% of the active military and 20% of new recruits are women.[26] Female veterans are also among the fastest-growing segment of new consumers of VA healthcare. Studies including both veterans and civilians reveal that PTSD is more prevalent in women than in men, which may be linked to the higher rates of sexual assault experienced by women.[27] A 2008 study by the RAND Corporation of individuals previously deployed in Operations Enduring Freedom and Iraqi Freedom in Afghanistan and Iraq revealed that female subjects faced substantially higher risks of developing major depression and PTSD than their male counterparts.[28] Women with PTSD tend to experience symptoms for a longer duration and have more associated physical problems than men.[29] Nonetheless, the absolute numbers of men and women veterans being treated by VA for MST-related conditions are similar, due to the higher proportion of men in the military.[30]

---

[26] Sally G. Haskell et al., *Gender Differences in Rates of Depression, PTSD, Pain, Obesity, and Military Sexual Trauma Among Connecticut War Veterans of Iraq and Afghanistan*, 19 J. Women's Health 267, 267 (2010).
[27] Inst. of Med., *PTSD Compensation and Military Service* 188 (2007) [hereinafter Inst. of Med., *PTSD Compensation*].
[28] RAND Corp., *Invisible Wounds of War: Psychological and Cognitive Injuries, Their Consequences, and Services to Assist Recovery* 99-100 tbls.4.5 & 4.6 (Terri Tanielian & Lisa H. Jaycox eds., 2008).
[29] Inst. of Med., *PTSD Compensation, supra* note 27, at 189.
[30] In fiscal year 2009, VA found that 21.9% of women and 1.1% of men screened by the Veterans Health Administration reported MST. However, the absolute numbers of people within each VA clinical population gender

**B.**     **Military sexual trauma can devastate a veteran's career, social and family networks, and physical and mental health**

From homelessness to chronic pain to mental health conditions, military sexual trauma is linked to an array of persistent negative consequences for survivors. One study found that 53% of homeless women veterans were sexually assaulted while in service.[31] This stark statistic is indicative of the multiple ways in which military sexual assault can affect a veteran's life. Homelessness often arises from unemployment, isolation from family members, substance abuse, or mental health disorders. While there is no one way that military sexual trauma affects a survivor, studies reveal that survivors are more likely to experience mental health disorders, certain physical conditions, and substance abuse. A 2000 study found that female veterans who reported in-service sexual trauma, compared to female veterans who did not, were less likely to be employed due to physical or psychological problems, felt more negatively about their military service, had a harder time adjusting to civilian life, and reported more psychological and substance-abuse problems.[32] VA recognizes that survivors may experience a variety of symptoms including strong emotions; feelings of numbness; trouble sleeping; difficulties with attention, concentration, and memory; problems with alcohol or other drugs; difficulty with things that remind them of their experiences of sexual trauma; relationship trouble; and physical

cohort who reported military sexual trauma were almost equal: 53,295 women and 46,800 men, respectively. *Healing the Wounds: Evaluating Military Sexual Trauma Issues: Hearing Before the Subcomm. on Disability Assistance and Mem'l Affairs of the H. Comm. on Veterans' Affairs*, 111th Cong. (2010) [hereinafter 2010 Congressional Hearing] (statement of Joy J. Ilem, Deputy National Legislative Director, Disabled American Veterans), *available at* http://veterans.house.gov/witness-testimony/joy-j-ilem-14.

[31] Donna L. Washington et al., *Risk Factors for Homelessness Among Women Veterans*, 21 J. Health Care for Poor & Underserved 81, 87 (2010).

[32] Katherine M. Skinner et al., *The Prevalence of Military Sexual Assault Among Female Veterans' Administration Outpatients*, 15 J. Interpersonal Violence 291, 298-304 (2000).

health problems including sexual difficulties, chronic pain, weight or eating problems, and gastrointestinal problems.[33]

Military sexual trauma is a stronger predictor of PTSD in veterans than many other traumas, including combat experience.[34] This comes as little surprise, as "rape is the trauma most highly correlated" with the development of PTSD.[35] One VA study found that female veterans who experienced in-service sexual assault are at a 59% higher risk for developing mental health conditions than veterans generally; the elevated risk among male veterans is slightly lower, at 40%.[36] Women who have experienced in-service sexual assault are nine times more likely to develop PTSD than women veterans with no history of sexual assault.[37] Among users of VA healthcare, MST is most frequently associated with "diagnoses of PTSD, depression and other mood disorders, psychotic disorders, and substance abuse disorders."[38]

Military sexual trauma can have severe physical health consequences regardless of any specific psychiatric diagnosis. Studies of civilian rape victims describe the long-term physical consequences of sexual assault, with survivors reporting themselves to be less physically healthy than similar individuals who have not experienced sexual assault, engaging in more negative

---

[33] VA, *MST Factsheet*, *supra* note 16, at 2.

[34] *See, e.g.*, Deborah Yaeger et al., *DSM-IV Diagnosed Posttraumatic Stress Disorder in Women Veterans with and Without Military Sexual Trauma*, 21 J. Gen. Internal Med. S65, S68 (2006).

[35] *Id.* at S65 (citing R.C. Kessler et al., *Posttraumatic Stress Disorder in the National Comorbidity Survey*, 52 Archives Gen. Psychiatry 1048, 1052-53 (1995)).

[36] U.S. Dep't Veterans Affairs, *VA Research Currents* 5 (2008), *available at* http://www.research.va.gov/resources/pubs/docs/va_research_currents_nov-dec_08.pdf.

[37] Alina Suris et al., *Sexual Assault in Women Veterans: An Examination of PTSD Risk, Health Care Utilization, and Cost of Care*, 66 Psychosomatic Med. 749, 755 (2004).

[38] 2010 Congressional Hearing, *supra* note 30 (statement of Bradley G. Mayes, Director, Compensation and Pension Service, Veteran Benefits Administration), *available at* http://veterans.house.gov/witness-testimony/bradley-g-mayes-17; *see also* Cheryl S. Hankin et al., *Prevalence of Depressive and Alcohol Abuse Symptoms Among Women VA Outpatients Who Report Experiencing Sexual Assault While in the Military*, 12 J. Traumatic Stress 601, 607-08 (1999) (finding that that women veterans who survived MST screened for symptoms of current depression at a rate three times higher, and for current alcohol abuse at a rate two times higher, than other women veterans receiving VA healthcare).

health behaviors like smoking and drinking alcohol, and suffering ongoing reproductive illness symptoms.[39] In addition to these general physical health consequences, survivors of military sexual trauma often suffer from the physical health consequences associated with specific psychiatric diagnoses. For example, female veterans with PTSD, with which sexual trauma is highly correlated, report more physical health problems than other female veterans seeking healthcare. These problems include obesity, irritable bowel syndrome, fibromyalgia, chronic pelvic pain, polycystic ovary disease, asthma, cervical cancer, and stroke.[40]

In-service sexual trauma can also have severe consequences for a service member's military career.[41] In the military setting, survivors often have no choice but to live and work closely with their assailants. Perpetrators may be supervisors, with direct control over the service member's daily life. Survivors who report their assaults often face ostracism and retaliation. Survivors who sought psychiatric support and treatment in the wake of an attack have reported losing security clearances.[42] At least one veteran was subsequently discharged for a "history of inappropriate relationships."[43] These professional consequences may continue when a service member leaves the military. Among female veterans using VA services, survivors of military sexual trauma had more difficulty finding work following discharge.[44]

[39] Alex Waigandt et al., *The Impact of Sexual Assault on Physical Health Status*, 3 J. Traumatic Stress 93, 99-100 (1990).

[40] Dorcas J. Dobie et al., *Posttraumatic Stress Disorder in Female Veterans: Association with Self-Reported Health Problems and Functional Impairment*, 164 Archives Internal Med. 394, 396 (2004).

[41] *DOD Report 2012*, *supra* note 11, at 27 (noting that of women who reported unwanted sexual contact, "26 percent indicated they experienced a combination of professional retaliation, social retaliation, administrative action, and/or punishments").

[42] First Amended Complaint ¶¶ 65, 307, Cioca v. Rumsfeld, No. 1:11cv00151 (E.D. Va. Sept. 6, 2011) [hereinafter Cioca Complaint].

[43] *Id.* ¶ 26.

[44] Skinner, *supra* note 32, at 298-301 (noting that "[w]omen reporting sexual harassment or sexual assault were more likely to be not working because of psychological reasons than their counterparts that did not report such experiences").

The effect of military sexual trauma on family and social relations can be devastating. Associated mental health disorders significantly compromise veterans' quality of life and often result in impaired social functioning. A study of Vietnam veterans with PTSD found these veterans much more likely to report marital, parental, and family-adjustment problems than veterans without PTSD.[45] It is also common for survivors of in-service rape, sexual assault, and sexual harassment to experience higher rates of alcohol and substance abuse.[46] Like survivors of civilian sexual assault, military sexual assault survivors often use alcohol and other drugs as coping mechanisms, to dull pain and traumatic memories. Substance abuse then wears away at the social fabric of a veteran's life, weakening crucial support systems.

## C. The military context intensifies harms associated with rape, sexual assault, and sexual harassment

Traumatic experiences shake one's sense of safety and self. Studies on the risk factors associated with PTSD development following sexual assault highlight that the survivor's feelings of helplessness, the survivor's social support following the incident, and early intervention all influence the development of PTSD.[47] Both anecdotal evidence and emerging research reveal that in-service sexual trauma "may be associated with qualitatively or quantitatively different psychological outcomes" than civilian sexual trauma due to unique aspects of military culture.[48] DOD itself has reported extensively on aspects of military culture that can make sexual assault

---

[45] Suris, *supra* note 14, at 181.

[46] Skinner, *supra* note 32, at 300-01.

[47] Kaitlin A. Chivers-Wilson, *Sexual Assault and Posttraumatic Stress Disorder: A Review of the Biological, Psychological, and Sociological Factors and Treatments*, 9 McGill J. Med. 111, 115 (2006).

[48] Amy Street & Jane Stafford, *Military Sexual Trauma: Issues in Caring for Veterans*, *in* Nat'l Ctr. for Post-Traumatic Stress Disorder & Walter Reed Army Med. Ctr., *Iraq War Clinician Guide* 66 (2004), *available at* http://www.ptsd.va.gov/professional/manuals/manual-pdf/iwcg/iraq_clinician_guide_ch_9.pdf.

more likely to occur, less likely to be reported, and more traumatic for survivors.[49] These factors may partially account for the fact that military sexual trauma survivors have higher rates of depression and current alcohol abuse and lower satisfaction with their family, health, and daily activities than veterans who experience sexual assault outside of the military.[50] Whereas the military's culture of solidarity may help survivors of combat trauma integrate their traumatic experiences, the opposite is true for survivors of military sexual trauma.

Unlike civilian survivors of sexual assault, service members who experience in-service rape, sexual assault, and sexual harassment often live and work with their assailants. The nature of the perpetrator-victim relationship is associated with the severity of subsequent symptoms of PTSD.[51] Fellow service members perpetrate the majority of military sexual assaults. These perpetrators cannot be avoided following the attack. One veteran from the Marines, for example, raped by a higher-ranking Marine, was forced by her command to live one floor below her rapist for two years following her report.[52] Although she requested to change housing, command denied her request. As part of her work detail, the veteran was required to report to her assailant on a daily basis. Continuing exposure to their assailants affords survivors limited opportunities to protect themselves from future victimization. This is particularly true if the assailant is a commanding officer, or if a commanding officer refuses to take action to protect a survivor. As DOD notes, military training drills deference to authority into recruits, which "may create conditions conducive to abuse of authority and perceived power."[53] Survivors in these situations

---

[49] U.S. Dep't of Defense, *Report of the Defense Task Force on Sexual Assault in the Military Services* 6-11 (2009) [hereinafter *DOD Report 2009*].
[50] Surís, *supra* note 14, at 192.
[51] Surís, *supra* note 37, at 750.
[52] *See* Cioca Complaint, *supra* note 42, ¶ 64.
[53] *DOD Report 2009*, supra note 49, at 7.

meet even the most limited definition of "helpless."[54] And because service members are considered constantly "on duty," they have limited opportunities to process their trauma.[55]

In studies of civilians and service members, lack of social support is one of the most consistently identified risk factors for the development of PTSD.[56] While the military's emphasis on intense training and unit cohesion often provides service members with a strong sense of community and purpose, this sentiment can be shattered by experiences of rape, sexual assault, and sexual harassment within the unit.[57] As the majority of sexual assaults are perpetrated by fellow service members, survivors' sense of safety and community may be irreparably breached. In addition, the prioritization of unit cohesion and combat readiness may lead to isolation of MST survivors. As one officer put it in a DOD report, "The expectations of a training environment are to get them in, get them trained, get them fit to fight . . . a sexual assault report stops this process momentarily . . . some leaders may view it as an inconvenience rather than a crime."[58] The violation of trust inherent in sexual assault may be all the greater in military populations "because of the nature of the job and the relationship to the perpetrator, which in turn may affect [survivors'] willingness to trust others and interact on a social level."[59]

This continued exposure to perpetrators and lack of social support for victims undermines the availability of early intervention, which is important for better medical and social outcomes. Because organizational cohesion is so highly valued within the military environment, divulging

[54] DOD recognizes that "[v]ictims who continue to serve in the same unit with their alleged assailant are likely to have diminished abilities to perform their duty due to concerns over personal safety and potential re-victimization." *Id.* at 11.

[55] Surís, *supra* note 37, at 750.

[56] Chris R. Brewin et al., *Meta-Analysis of Risk Factors for Posttraumatic Stress Disorder in Trauma-Exposed Adults*, 68 J. Consulting & Clinical Psychol. 748, 753 tbl.4, 755 (2000).

[57] *DOD Report 2009*, *supra* note 49, at 10.

[58] *Id.* at 7.

[59] Surís, *supra* note 14, at 192.

17

any negative information about a fellow soldier is considered taboo. Service members feel pressured to be team players; as a result, instead of seeking treatment for their trauma, survivors often feel that they must "suck it up" and "mak[e] excuses for behavior of the . . . offenders," or else they will be ostracized.[60] Many survivors are encouraged to keep silent after attacks; one veteran was warned that "bad things happen to those who rock the boat."[61] A 2008 report by the GAO found that perceived stigma undermined survivors' willingness to seek treatment.[62] A 2004 DOD report on sexual assault highlighted that survivors often fear prosecution of other crimes that occurred at the time of the attack, including underage drinking, adultery, and fraternization.[63] Because the majority of survivors of military sexual trauma do not report their assaults, they often do not have access to resources that can guide them to post-trauma readjustment.

When a service member does report their sexual assault or harassment, that process itself may be traumatizing—an effect called "secondary victimization."[64] Legal and medical personnel can engage in victim-blaming practices that exacerbate the survivor's trauma, resulting in increased PTSD symptoms. Veterans recount having their reports ignored or facing official charges for conduct related to the incident such as slander, drinking, and fraternization.[65] A study of 268 survivors of sexual assault, recruited through a VA clinic, found that most victims had

---

[60] *DOD Report 2009*, *supra* note 49, at 10.

[61] *See* Cioca Complaint, *supra* note 42, ¶ 108.

[62] U.S. Gov't Accountability Office, GAO-08-1013T, *Military Personnel: Preliminary Observations on DOD's and the Coast Guard's Sexual Assault Prevention and Response Programs* 12 (2008) [hereinafter GAO, *Military Personnel*], *available at* http://www.gao.gov/assets/130/120945.pdf.

[63] U.S. Dep't of Def., *Task Force Report on Care for Victims of Sexual Assault* 28 (2004), *available at* http://www.defenselink.mil/news/May2004/d20040513SATFReport.pdf.

[64] Rebecca Campbell & Sheela Raja, *The Sexual Assault and Secondary Victimization of Female Veterans: Help-Seeking Experiences with Military and Civilian Social Systems*, 29 Psychol. of Women Q. 97 (2005).

[65] *See* Cioca Complaint, *supra* note 42, ¶¶ 87-91. After one service member attempted to report her rape in 2006, her victim advocate advised her not to report a subsequent assault and harassment because she would be seen as "difficult." *Id.* ¶ 91.

18

been previously discouraged from filing a report.[66] Military legal personnel frequently refused to take reports of sexual assault or told survivors that the assault was not serious enough to pursue. Having this type of invalidating experience following a sexual trauma is likely to have a significant negative impact on the victim's post-trauma adjustment. The study of survivors recruited through VA clinic revealed that the majority of those who reported their experiences through military channels, both legal and medical, experienced a variety of secondary victimization emotions, including feelings of guilt, depression, anxiety, and distrust of others.[67] As a result of their treatment by military legal personnel, 83% of MST survivors reported that they were unlikely to pursue further help.[68] This percentage becomes more pronounced when considering the already low rates of reporting.

## D. Care without compensation for survivors of military sexual trauma is insufficient

Compensation confers important benefits on service-connected veterans that care alone cannot provide. Compensation and care are properly viewed as complementary rather than substitutes. The Veterans Health Administration ("VHA") screens veterans for MST and provides free services to survivors regardless of VA disability rating.[69] In 2010, 108,121 veterans screened positive for MST.[70] The VHA requires no documentation or records of reporting at the time of the assault. These services are critical for veterans who suffer the consequences of MST

---

[66] Campbell & Raja, *supra* note 64, at 101-02.

[67] *Id.* at 102-03.

[68] *Id.* at 102.

[69] *Military Sexual Trauma*, U.S. Dep't of Veterans Affairs, http://www.mentalhealth.va.gov/msthome.asp (last updated June 6, 2013).

[70] Service Women's Action Network, *Rape, Sexual Assault, and Sexual Harassment in the Military: The Quick Facts* 2 (2012), *available at* http://servicewomen.org/wp-content/uploads/2012/06/RSASH-Quick-Facts_April-2012-FINAL.pdf (citing U.S. Dep't of Veterans Affairs, Office of Mental Health Services, *Summary of Military Sexual Trauma-Related Outpatient Care Report, FY 2010* (2011)).

and cannot afford private healthcare. But regardless of the potential availability of MST treatment for all veterans, studies show that service connection results in improved access to VA healthcare generally.[71] Veterans who are service connected are more likely to use VA healthcare than veterans who are not.[72] One study of veterans seeking disability compensation for PTSD found that 58% of subjects believed that once they were service connected, they could "focus on getting better."[73]

Because PTSD and other mental health disorders often affect a veterans' ability to find or maintain gainful employment, disability compensation is a critical economic lifeline for many survivors of military sexual assault. Perhaps most importantly, for many veterans, service connection for disabilities due to MST "represents validation, connotes gratitude for their service to their country and recognizes the tribulations they endured while serving."[74]

## V.    Current rule

The current regulations governing VA adjudications for service connection fail veterans suffering from mental health conditions resulting from in-service rape, sexual assault, and sexual harassment. Through VA, a veteran can apply for disability benefits for conditions incurred or aggravated by military service, or in other words, conditions that are service connected. A veteran applies for service connection by submitting necessary information to a VA Regional

---

[71] 2010 Congressional Hearing, *supra* note 30 (statement of Joy J. Ilem, Deputy National Legislative Director, Disabled American Veterans), *available at* http://veterans.house.gov/witness-testimony/joy-j-ilem-14.
[72] *Review of Combat Stress in Women Veterans*, *supra* note 6, at 55-56, 60; Inst. of Med., *PTSD Compensation*, *supra* note 27, at 179-80.
[73] Nina A. Sayer, Michele Spoont & Dave Nelson, *Veterans Seeking Disability Benefits for Post-Traumatic Stress Disorder: Who Applies and the Self-Reported Meaning of Disability Compensation*, 58 Soc. Sci. & Med. 2133, 2138 tbl.2 (2004).
[74] 2010 Congressional Hearing, *supra* note 30 (statement of Joy J. Ilem, Deputy National Legislative Director, Disabled American Veterans), *available at* http://veterans.house.gov/witness-testimony/joy-j-ilem-14; *see also* Sayer, Spoont & Nelson, *supra* note 73, at 2138 tbl.2 (three-fourths of subjects surveyed—veterans seeking disability compensation for PTSD—endorsed "It will show that there is a reason for my problems" and "It will show that the government acknowledges how I was affected by my military experiences" as motivations for their claims).

Office ("VARO"). The VARO makes an initial determination, and any veteran who is rejected can ask the VARO to reconsider its denial. The veteran may also file an administrative appeal to the Board of Veterans' Appeals ("BVA"). Specific procedures and deadlines apply. As they pursue their claim, most veterans are either unrepresented or assisted by non-lawyer veterans' services officers who are accredited by VA. The average time that a veteran waits for a decision by a VARO is 260 days.[75] If a veteran chooses to appeal to the BVA, she faces an average wait time of three-and-a-half years.[76]

The process of applying for service connection is riddled with evidentiary obstacles. The current rule governing claims for PTSD resulting from MST is set out in 38 C.F.R. § 3.304(f)(5). It provides a detailed but non-exhaustive list of the kinds of evidence veterans may present to corroborate their in-service stressor, including non-military medical records, such as from rape crisis centers and mental health counseling centers; statements made to friends and family; and evidence of behavioral changes such as deterioration in work performance or substance abuse. The text of the rule states:

> If a posttraumatic stress disorder claim is based on in-service personal assault, evidence from sources other than the veteran's service records may corroborate the veteran's account of the stressor incident. Examples of such evidence include, but are not limited to: records from law enforcement authorities, rape crisis centers, mental health counseling centers, hospitals, or physicians; pregnancy tests or tests for sexually transmitted diseases; and statements from family members, roommates, fellow service members, or clergy. Evidence of behavior changes following the claimed assault is one type of relevant evidence that may be found in these sources. Examples of behavior changes that may constitute credible evidence of the stressor include, but are not limited to: a request for a transfer to another military duty assignment; deterioration in work performance; substance abuse; episodes of depression, panic attacks, or anxiety

---

[75] Aaron Glantz, *Accuracy Isn't Priority as VA Battles Disability Claims Backlog*, Ctr. for Investigative Reporting (Nov. 8, 2012), http://cironline.org/reports/accuracy-isn%E2%80%99t-priority-va-battles-disability-claims-backlog-3983.
[76] *Id.*

without an identifiable cause; or unexplained economic or social behavior changes.

VA promulgated this rule in 2002 in an attempt to ease the evidentiary burdens preventing survivors of military sexual trauma and other kinds of personal assault from proving service connection for their PTSD. Yet more than a decade later, the numbers show that this evidentiary burden still operates to bar many meritorious MST-related claims. In fiscal years 2008-2010, VA denied two out every three MST-related claims.[77] VA denies claims for service-connected PTSD stemming from rape, sexual assault, or sexual harassment at much higher rates than claims for PTSD overall: during the same period, only 32.3% of MST-based PTSD claims were approved by VA, compared to an approval rate of 54.2% of all other PTSD claims.[78] These denials fall disproportionately on women, who are more likely than men to suffer PTSD as a result of MST, because "there are huge barriers to women being able to independently substantiate" their experiences of military sexual trauma.[79]

These disparities occur for two primary reasons. First, veterans whose mental health conditions stem from in-service rape, sexual assault, or sexual harassment often struggle to produce evidence of their in-service stressor due to widespread underreporting of such attacks to both official and unofficial sources. Second, VA adjudicators likely reflect the same, often

---

[77] Service Women's Action Network, *Rape, Sexual Assault and Sexual Harassment in the Military* 2 (2012), *available at* http://servicewomen.org/wp-content/uploads/2012/10/Final-RSASH-10.8.2012.pdf.
[78] 2012 Congressional Hearing, *supra* note 22 (statement of Anu Bhagwati, Executive Director, Service Women's Action Network), *available at* http://veterans.house.gov/witness-testimony/ms-anu-bhagwati-0. Data recently disclosed to SWAN in partial settlement of pending Freedom of Information Act litigation in U.S. District Court and not yet fully analyzed demonstrate that this gap has persisted in FY2011-12 even while it has narrowed somewhat. See email message and attachments from Jonathan Cooper, Trial Attorney, U.S. Department of Justice, to counsel for Plaintiffs in *SWAN et al. v. DoD et al.*, No. 3:10-cv-1953-SRU (D.Conn.), dated June 6, 2013.
[79] Inst. of Med., *PTSD Compensation, supra* note 27, at 192.

22

unconscious biases known to exist in civilian law enforcement against survivors of sexual assault.[80]

Despite these issues, VA continues to allow its adjudicators significant discretion to decide how to weigh the evidence corroborating and rebutting the occurrence of in-service sexual assaults and sexual harassment. The result is that VA adjudicators privilege certain types of corroborating evidence that many survivors cannot produce (including evidence that even the current rule does not require) and generally treat claims of MST-triggered PTSD with suspicion.

## A. Systemic underreporting deprives survivors of rape, sexual assault, and sexual harassment of the documentation necessary to corroborate their claims

Many survivors of rape, sexual assault, and sexual harassment remain silent in the aftermath of their attack. This is due to many factors, including privacy concerns, fear of reprisal, and the stigma attached to sexual assault and harassment. In the civilian population, 65% of people who experience rape or sexual assault choose not to report the attack to police, making rape and sexual assault the violent crimes most likely to go unreported.[81] The issue of underreporting is even more insidious in the military, where survivors often work and share close quarters with the perpetrator.[82] DOD estimates that in fiscal year 2012, 89% percent of service members who experienced sexual assault did not report it to a DOD official.[83] In a separate 2010 study prepared for the Air Force, 92.5% of men and 79.5% of women reported that they did not

---

[80] *See infra* Section V.B.

[81] Bureau of Justice Statistics, U.S. Dep't of Justice, *National Crime Victimization Survey: Victimizations Not Reported to the Police, 2006-2010*, at 4 (2012) [hereinafter BJS, *Crime Victimization Survey*].

[82] Of the service members who reported experiencing a sexual assault in 2010, about half identified their assailant as a "military coworker." Lindsay M. Rock et al., Def. Manpower Data Ctr., No. 2010-025, *2010 Workplace and Gender Relations Survey of Active Duty Members: Overview Report on Sexual Assault* 20-21 (2011).

[83] *DOD Report 2012*, supra note 11, at 25.

receive help after being sexually assaulted. This includes foregone legal counseling, mental health services, and medical care.[84]

Among the significant barriers to the reporting of military sexual violence is lack of privacy and confidentiality.[85] A 2010 DOD survey revealed that, of service members who had been sexually assaulted and did not report the incident, 60% of the women and 36% of the men cited their belief that their accounts would not be kept confidential as a barrier to reporting.[86] As of 2005, service members who experience sexual assault or harassment have the option to file a "restricted" or "unrestricted" report. If a survivor files a restricted report, which is reviewed by his or her commander, the details of the incident are to remain confidential, the survivor may receive treatment and counseling, and no investigative process is triggered. However, some military sexual assault responders report that commanders sometimes push for disclosure of the identities of the victim and perpetrator, compromising the promise of confidentiality.[87] Furthermore, "soldiers must disclose their rank, gender, age, race, service, and the date, time and/or location of the assault, which in the closed world of a military unit hardly amounts to anonymity."[88] Despite receiving training in the sexual assault reporting options, service members of all ranks "do not believe that restricted reports will be kept confidential. . . . One focus group participant quipped, 'If you want something to get out, all you have to do is say it's a secret.'"[89]

Before 2005, service members could file only unrestricted reports; restricted reports, and their promise of confidentiality, were not available. Filing an unrestricted report triggers an

---

[84] Darby Miller Steiger et al., U.S. Air Force, *Findings from the 2010 Prevalence/Incidence Survey of Sexual Assault in the Air Force* 40 (2010), *available at* http://www.afpc.af.mil/shared/media/document/AFD-110317-008.pdf.
[85] *Id.* at 37-38.
[86] Rock, *supra* note 82, at v.
[87] *DOD Report 2009, supra* note 49, at 32; *see* Cioca Complaint, *supra* note 42, ¶ 121.
[88] Helen Benedict, *The Private War of Women Soldiers*, Salon, Mar. 7, 2007, http://www.salon.com/2007/03/07/women_in_military/.
[89] *DOD Report 2009, supra* note 49, at 32.

24

official investigation into the assault or harassment, including evidence collection. Survivors who file an unrestricted report "cannot be anonymous."[90] In practice, an unrestricted report means that a service member's entire unit knows about the incident.[91] A lawsuit filed in 2011 by survivors of rape, sexual assault, and sexual harassment in the military details how after reporting, survivors were subjected to escalated abuse and harassment not only from their attackers, but from other members of their units and even from members of units to which they subsequently transferred.[92]

Survivors of in-service rape, sexual assault, and sexual harassment are also often reluctant to report their attacks for fear of retaliation, whether from their attackers, their peers, or their supervisors. In the civilian context, the Department of Justice reports that among victims of rape and sexual assault who do not report to the police, fear of reprisal or "getting the offender in trouble" are the most common reasons cited for not reporting the attack.[93] These concerns are present in the military environment, where the high value placed on unit cohesion can dissuade reporting of sexual assaults. Acquaintance rape is also extremely common.[94] Not only do survivors usually know their attackers, they are frequently professionally subordinate to them. About a quarter of survivors of sexual assault in the military identified their attackers as within their chain of command, and 38% of women and 17% of men reported that their attacker was of

---

[90] Irene Williams & Kunsook Bernstein, *Military Sexual Trauma Among U.S. Female Veterans*, 25 Archives of Psychiatric Nursing 138, 141 (2011).

[91] *See* Benedict, *supra* note 88 ("Military platoons are enclosed, hierarchical societies, riddled with gossip, so any woman who reports a rape has no realistic chance of remaining anonymous. She will have to face her assailant day after day, and put up with rumors, resentment and blame from other soldiers.").

[92] Cioca Complaint, *supra* note 42, ¶¶ 24, 61, 90, 111, 131, 155, 196, 236, 297.

[93] BJS, *Crime Victimization Survey*, *supra* note 81, at 4.

[94] Most reports of sexual assault involve service member-on-service member assault. In 2012, 62% of unrestricted reports of sexual assault fell into this category. *DOD Report 2012*, *supra* note 11, at 60.

a higher rank, though not in their chain of command.[95] In this climate, fear of reprisal accounts for much of the underreporting of rape, sexual assault, and sexual harassment.[96]

Unfortunately, in many cases, these fears are borne out, as survivors who do make reports face isolation, retribution, or accusations of lying, irresponsibility, or impropriety.[97] Survivors who file a report risk not only social and professional retaliation, but also legal consequences, as they may be charged themselves for having inappropriate relations with their attackers or for other offenses.[98] DOD's own reporting procedure keeps this chilling thought forefront in survivor's minds. In order to report sexual assault, survivors must sign a statement of understanding that concludes, "Any misconduct on my part may be punished."[99] The commander, at his discretion, may investigate and punish the survivor even before resolution of the sexual-assault charge.[100] Due to the damaging consequences of reporting sexual assault in the military, over a third of female service members who reported their attacks said that they would

---

[95] Lindsay Rock, Def. Manpower Data Ctr., No. 2013-007, *2012 Workplace and Gender Relations Survey of Active Duty Members* 37-38 (2013).
[96] Fifty-four percent of service women and 27% of service men who did not report their sexual assaults "were afraid of retaliation or reprisals from the person who did it or their friends" and "52% [of service women; 24% of men] feared being labeled a troublemaker, 40% [of service women, 20% of men] thought their performance evaluation or chance for promotion would suffer, and 24% [of service women,14% of men] were afraid that they or others would be punished for infractions or violations." Rock, *supra* note 82, at 43. In general, a victim is less likely to report a crime when the offender is someone he or she knows, but not a relative or intimate partner. BJS, *Crime Victimization Survey, supra* note 81, at 6.
[97] Sixty-two percent of women who filed an unrestricted report of sexual assault reported subsequent administrative action, professional retaliation, or social retaliation against them; of those, over a third experienced all three. Rock, *supra* note 82, at 42.
[98] Cioca Complaint, *supra* note 42, ¶¶ 58, 87, 93, 125, 132, 165, 170, 184, 191,193; Helen Benedict, *The Plight of Women Soldiers*, The Nation, May 5, 2009, http://www.thenation.com/article/plight-women-soldiers#. Before the end of "Don't Ask, Don't Tell," male service members who were sexually assaulted by male colleagues also risked professional retaliation for perceived homosexuality. *See, e.g.*, Cioca Complaint, *supra* note 42, ¶ 74.
[99] DD Form 2910, *Victim Reporting Preference Statement* (2008) [hereinafter DD2910], *available at* http://www.sapr.mil/media/pdf/ miscelaneous/toolkit/dd2910.pdf.
[100] *Id.*

choose to remain silent if they had to do it all over again; 29% of men who reported reached the same conclusion.[101]

Moreover, veterans who have reported their MST experiences often are encouraged to stay silent or are implicitly discouraged from further reporting by inaction from their superiors. Many service members do not believe that military authorities can or will help them or that their reports will result in any action against their attackers.[102] In some cases, commanders or even victim's advocates tell service members that they can or will do nothing, discouraging further reporting if the abuse continues to escalate.[103] DOD statistics reveal that of the 2,353 dispositions of sexual assault investigations in fiscal year 2011, just under one-third (791) actually resulted in disciplinary action for sexual assault charges.[104]

Even if a survivor files a restricted report soon after his or her assault, this evidence may not be available to corroborate the stressor when the survivor applies for VA benefits. As noted by Disabled American Veterans, "Restricted records are highly credible resources but it is questionable if they are readily available, even with the consent of the veteran."[105] Furthermore, as of December 2011, DOD destroys restricted reports and evidence collected from service members using restricted reports after five years, eliminating the paper trail for veterans who may later decide to file for service-connected disability benefits.[106] DOD now maintains

---

[101] Rock, *supra* note 82, at 35-36.
[102] GAO, *Military Personnel*, *supra* note 62, at 14 (noting that survivors do not report military sexual assault because of "the belief that nothing would be done"); Cioca Complaint, *supra* note 42, ¶¶ 52, 129, 139-40, 239.
[103] Cioca Complaint, *supra* note 42, ¶¶ 31, 32, 34, 91.
[104] U.S. Dep't of Def., *Annual Report on Sexual Assault in the Military: Fiscal Year 2011*, 32 (2012), *available at* http://www.sapr.mil/index.php/annual-reports.
[105] 2012 Congressional Hearing, *supra* note 22 (statement of Joy J. Ilem, Deputy National Legislative Director, Disabled American Veterans), *available at* http://veterans.house.gov/witness-testimony/ms-joy-ilem.
[106] U.S. Deputy Sec'y of Def., Directive-Type Memorandum (DTM) 11-062, *Document Retention in Cases of Restricted and Unrestricted Reports of Sexual Assault* 2-3 (Dec. 16, 2011), *available at* https://www.hsdl.org/?view&did=727333.

unrestricted reports for 50 years. However, prior to the December 2011 rule change, the rules for destruction and retention of paperwork regarding military sexual assault varied between the service branches, making any kind of documentation difficult to track down for thousands of veterans.[107]

Service members who do not report their sexual assaults at the time of the incident, meanwhile, face even more onerous hurdles. Veterans who did not report their attacks are generally left without the contemporaneous records that are often necessary to successful service-connected disability claims. While current regulations allow service members to submit secondary evidence including evidence of behavioral changes, affidavits from friends and family, and other non-military records, service members may choose to hide the experience entirely from their social circle, effectively erasing any record of it. The same factors that are most often cited as reasons survivors choose not to report to military authorities—shame, embarrassment, fear of not being believed, and stigma[108]—often inhibit survivors from approaching friends, family, and civilian medical professionals.[109] As one survivor put it, "Who are you gonna tell? I'm . . . 18 at the time, I'm in Germany. Not too many other girls around."[110]

Service members may be even more reluctant than civilians to disclose their assault to friends and family. In civilian life, only about a third of individuals who are injured during their

---

[107] Tyrone C. Marshall Jr., *DOD Implements New Changes to Sexual Assault Response*, U.S. Air Force (Apr. 2, 2012), http://www.af.mil/news/story.asp?id=123296343.

[108] *DOD Report 2009*, *supra* note 49, at 30-31.

[109] *See* Jeffrey S. Jones et al., *Why Women Don't Report Sexual Assault to the Police: The Influence of Psychosocial Variables and Traumatic Injury*, 36 J. Emergency Med. 417, 422 (2009) (acknowledging that many women do not report their rapes to medical authorities); Marjorie R. Sable et al., *Barriers to Reporting Sexual Assault for Women and Men: Perspectives of College Students* 55 J. Am. College Health 157, 160 (2006) (noting that for college students, "[s]hame, guilt, and embarrassment—not wanting friends and family members to know about the rape or sexual assault—continue to dominate victims' concerns").

[110] Mimi Chakarova, *Her War: The Invisible Crisis of Women Veterans*, Ctr. for Investigative Reporting (Nov. 8, 2012), http://cironline.org/reports/her-war-invisible-crisis-women-veterans-3981.

rape receive medical care;[111] about a third of college-age women do not report their sexual assault to anyone.[112] (The "vast majority" of victims of sexual assault in the military in recent years have been women under the age of 25.[113]) The military requires survivors who wish to make a restricted report to sign a statement acknowledging that their information may be reported to command and the incident investigated, contrary to their wishes, "if I talk about my sexual assault to anyone other than those under the 'Restricted Reporting' option."[114] Many survivors may therefore be reluctant to discuss their assault with anyone, for fear that their account will be transmitted to command.

VA adjudicators expect veterans' work performance and personal life to suffer after their assault. However, not all survivors react to an attack in the same way, and some cope by redoubling their professional efforts. VA adjudicators find that service members who do not react to their rapes as expected are not credible. For example, in 2012 the BVA refused to grant one claimant a medical examination to determine the source of his PTSD, based in part on the veteran's strong performance reviews and his desire to stay in the military.[115] Survivors such as this veteran not only lack evidence of an assault report but also will be unable to show the expected behavioral changes or other secondary evidence corroborating the assault.

As a result of these issues, the rule change in 2002 that allowed veterans to present secondary evidence to demonstrate the occurrence in-service personal assaults is inadequate to

---

[111] Patricia Tjaden & Nancy Thoennes, *Full Report of the Prevalence, Incidence, and Consequences of Violence Against Women: Findings From the National Violence Against Women Survey* 54 (2000).
[112] Bonnie S. Fisher et al., Dep't of Justice, *The Sexual Victimization of College Women* 23 (2000).
[113] *DOD Report 2012*, *supra* note 11, at 80-81.
[114] DD2910, *supra* note 99.
[115] No. 09-34 322, 2012 WL 2316006 (Apr. 24, 2012).

29

address the needs of veterans with service-connected mental disabilities stemming from military sexual trauma.

## B.  VA adjudicators often misapply the current evidentiary standard

Low rates of approval for veterans claiming service connection for PTSD stemming from MST result not only from evidentiary burdens that are often impossible to satisfy, but also from adjudicators' failure to properly apply their discretion. Congress requires VAROs to grant claimants the benefit of the doubt,[116] but the reality is that veterans applying for service connection for PTSD resulting from in-service rape, sexual assault, or sexual harassment are functioning under a cloud of suspicion. This results in disparate treatment of veterans with MST-related PTSD, in comparison to other veterans with PTSD. VAROs regularly fail to credit the evidence of in-service stressors that their regulations require they consider. Adjudicators improperly dismiss medical reports from after veterans' service in which treating VA physicians conclude that the veteran experienced in-service rape, sexual assault, or sexual harassment; reject corroborating medical evidence from veterans' service such as records of treatment for STDs or pregnancy following rape; and ignore potential witnesses to the aftermath of the MST. A selection of recent examples of such incidences at VA are summarized below. In denying dozens of worthy MST-related claims as uncorroborated or not credible, VAROs wrongfully deny veterans the benefits they need and deserve.

VA adjudicators' disregard for veterans with mental health disabilities resulting from in-service sexual trauma is also apparent from VAROs' frequent failure to assist such veterans with developing their claims. VA has a duty under the Veterans Claims Assistance Act of 2000

---

[116] 38 U.S.C. § 5107 (2006).

("VCAA") to help veterans develop their benefits claims.[117] Assistance includes notifying veterans of evidence that can be used to supplement or corroborate their claims, helping veterans gather that evidence, and compiling certain evidence independently.[118] The examples of individual claims adjudications included below also highlight instances of VA adjudicators failing to uphold their duty to help veterans develop their claims for MST-related PTSD.

In case after case overturning or remanding VARO denials of service connection, BVA opinions reveal that the regional adjudicators either did not recognize the sufficiency of the evidence on record to give the veteran the benefit of the doubt, or they did not recognize that the evidence met a threshold requiring the RO to assist in further claim development. While remands at the BVA can ultimately lead to the correction of some of these errors, they do so at great cost of time and expense to veterans and to VA.

The following cases illustrate these problems at the VARO level:

(1) In July 2009, the VARO of Boise, Idaho, denied Veteran A's entitlement to service-connected disability compensation for PTSD related to MST. The veteran claimed she was sexually assaulted in June 1981. Numerous VHA treatment records dating back to 1999 noted the veteran's history of MST, long before her claim for disability benefits. The veteran's service treatment record from June 1981 showed a diagnosis of trichomonas vaginalis. Service treatment records from November 1981 "reflect that the Veteran complained of pelvic pain for several days, followed by abnormal bleeding and signs and symptoms of pregnancy . . . that was suspected of being a spontaneous miscarriage. . . . [T]he Veteran was hospitalized with an

---

[117] Veterans Claims Assistance Act of 2000, P.L. 106-475, 114 Stat. 2096 (codified as amended at 38 U.S.C. ch. 51).
[118] 38 U.S.C. §§ 5102(b), 5103(a), 5103A (2006).

admission diagnosis of pelvic inflammatory disease and a possible incomplete abortion . . . ." The veteran also had a post-service history of substance abuse.

The veteran presented substantial medical and behavioral evidence that she had been sexually assaulted. Yet the VARO appears to have relied, at least in part, on the fact that the veteran's records did not specifically mention military sexual trauma or "psychiatric treatment," and that "a negative reply was received in April 2009 from the Naval Criminal Investigative Service in response to an inquiry by the RO in an attempt to verify her alleged sexual trauma." The VARO's emphasis on the lack of official reporting records ignores that the veteran may submit corroborating evidence per § 3.304(f)(5) specifically because she may not have reported the sexual assault during her years in service.[119]

(2) In 2005, the Philadelphia VARO denied Veteran B's claim to service connection for PTSD triggered by an in-service rape in September 1980. Veteran B did not appeal, but submitted new evidence in 2006; the New York City VARO re-opened her claim and denied it. The BVA heard the case after another hearing at the VARO in 2011. Even at the time of the 2005 denial, and certainly by the 2011 hearing, the VARO adjudicator had ample corroboration of the rape that caused the veteran's PTSD.

Contrary to the VARO's 2005 finding that "there was no credible supporting evidence establishing that her claimed in-service stressor occurred," the VARO possessed, in 2005, a) records showing a decline in the veteran's performance reviews in the years after her alleged rape; b) records showing the birth of the veteran's son in June 1981, approximately nine months after her alleged rape; c) records of treatment of numerous STDs in 1980 and 1981; d) discharge records from 1985 showing that the veteran was abusing drugs; and e) notice in the veteran's

---

[119] No. 10-04 780, 2012 WL 3269936 (June 19, 2012).

32

service personnel records that she bounced several checks in 1985. The VARO denied a claim for service connection for PTSD resulting from in-service sexual assault even when in possession of evidence showing deterioration in work performance, pregnancy tests and tests for sexually transmitted diseases, and behavior changes following the claimed assault, including substance abuse and unexplained economic behavior changes. All of these are acceptable forms of corroboration under 38 C.F.R. § 3.304(f)(5).

In 2005, the VARO also possessed a report from a VA PTSD examination from February 2001, in which the doctor opined that "the Veteran's PTSD symptomatology had been chronic since her reported in-service sexual trauma." The VARO failed to request further clarification from the doctor as to what evidence corroborated the occurrence of the stressor, denying Veteran B's claim without developing it. The VARO's failure to assist the veteran is also apparent from the BVA decision on May 24, 2012, which noted that the veteran's records, including potentially important service- and private-treatment records, were clearly incomplete.[120]

(3) In December 2009 and again in a statement of the case in April 2011, the San Diego VARO denied Veteran C's entitlement to service connection for PTSD and major depressive disorder stemming from an in-service rape. The veteran claimed that she was raped by a fellow service member on Valentine's Day, 1999. The veteran's service treatment records showed treatment for pelvic pain and a urinary tract infection on February 18, 1999, just four days after the rape. The veteran reported the rape consistently to a number of VA medical facilities, and her October 2009 VA treatment records showed a diagnosis of "PTSD secondary to military sexual trauma." Thus, the record contained evidence of medical conditions immediately after the claimed rape with clear links to sexual trauma, as well as corroborative medical findings from a

---

[120] No. 07-19 622, 2012 WL 2882909 (May 24, 2012).

VA doctor that the in-service rape caused the veteran's psychiatric disorders. The BVA observed that "[n]o competent medical professional has found that the Veteran's subjective history was unreliable."[121]

(4) Veteran D appealed to the BVA after a 2011 hearing following the New Orleans VARO's 2008 denial of his claim for service connection for PTSD resulting from a sexual assault by his superior officer in 1962. The veteran had a diagnosis of PTSD and was able to produce some contemporary evidence of the stressor, namely that his separation report from 1965 indicated problems sleeping. The veteran further testified that he had "self-medicated with alcohol," but did not have third-party evidence of his behavior at the time of his service. In 2009, his treatment record from VA indicated that his treating psychiatrist "relate[d]" the PTSD to MST, but did not state with sufficient clarity why the psychiatrist believed that the trauma had occurred. The VARO does not appear to have examined other, available VA records from 2008. Additionally, "[i]n December 2010 the Veteran submitted a list of 7 people, which included addresses, indicating that they had witnessed his behavior and personality changes upon his release of active duty."

Despite indications that evidence corroborating the veteran's stressor was available, the VARO denied Veteran D's claim without notifying him of the requirements to prove his claim and without assisting him with its further development, such as requesting a VA medical examination to clarify the connection between the veteran's PTSD and MST. This was in contravention of the VCAA.[122]

---

[121] No. 11-11 873A, 2012 WL 2880197 (May 9, 2012).
[122] No. 10-03 771, 2012 WL 2316246 (Apr. 25, 2012).

(5) In 2005 and at least once more in July 2011, the New York City VARO denied

service connection for Veteran E's mental health disorders, including PTSD. Veteran E

appealed, claiming that he suffered from PTSD caused by a sexual assault during the his service

aboard the U.S.S. Leahy in 1978, following which his assailant had harassed him and "coerced

him into a sexual relationship." The veteran presented the following evidence to corroborate the

assault:

- Service personnel records showing a number of disciplinary infractions beginning in 1978, the year of the assault, two years into what had been until then meritorious service.
- A negative performance note from July 1978.
- Service-treatment records reporting a clean bill of health before the assault and the onset of medical problems after, including possible venereal disease in 1978, treatment for a penile rash in mid-1979, and gonorrhea in January 1980.
- A 1993 VA substance abuse disorders treatment note reflecting the veteran's report of prior sexual abuse, a decade before he applied for VA benefits. This was followed by another report of sexual abuse in 2002 and a report in 2008 to a VA "mental health care professional" of the sexual assault aboard the U.S.S. Leahy.
- A positive PTSD screening in 2001; records of VA mental health treatment for MST from 2008, 2009, and 2010; and repeated diagnoses in 2008 and 2010 of PTSD by VA doctors attributing the veteran's PTSD to MST. The 2010 examiner reviewed the claims file and "concluded that the Veteran experienced PTSD 'directly attributable to his military sexual trauma to a high degree of certainty, certainly greater than 50 percent probability.'"

Despite a record showing unexplained social behavior changes and deterioration in work

performance, sexually transmitted diseases, substance abuse, and multiple diagnoses by VA

doctors of PTSD caused by MST, the VARO held that the veteran's "claimed stressors could not

be verified."[123]

These and other cases make clear that, even in the face of agency rules directing VAROs

to give special consideration to secondary evidence when determining service connection for

---

[123] No. 05-32 816, 2012 WL 2311064 (Apr. 12, 2012).

PTSD resulting from MST, VAROs across America refuse to apply appropriate presumptions to these claims. The BVA is sometimes able to correct the errors of regional adjudicators on appeal, but it does so at tremendous expense in time and effort to the veteran who may have been waiting decades for life-saving disability compensation. In fiscal year 2011, the appeals process took, on average, 1,123 days from the time the veteran notified the VARO of her disagreement with the VARO decision to the disposition of the appeal by the BVA.[124] A remand from the BVA added an additional 427 days to the process before the veteran resolved her claim.[125] And VA claims backlog is expected to grow.[126] For veterans with service-connected disabilities who are in great need, an additional four-year delay is no solution.

### Potential reasons why VA adjudicators frequently reject MST claims

The consequences of the current rule for victims of military sexual assault, while unfortunate, are unsurprising. Researchers have extensively documented police, prosecutor, and court suspicion of victims of rape, sexual assault, and sexual harassment in the civilian context. Rape is no more likely to be falsely reported than most other felonies.[127] However, the FBI reports that while about 65% of reported murders are "cleared" (meaning that the offender was arrested, charged, and turned over for prosecution, or that the offender was identified but the process could not continue due to the offender's death or other circumstances beyond police control), only about 41% of reported rapes are "cleared."[128] A full 80% of rape and sexual assault

[124] Bd. of Veterans' Appeals, *Report of the Chairman: Fiscal Year 2011* 18 (2012), *available at* http://www.bva.va.gov/docs/Chairmans_Annual_Rpts/BVA2011AR.pdf [hereinafter *BVA Report 2011*].
[125] *Id.*
[126] U.S. Dep't of Veterans Affairs, Office of Inspector Gen., 10-03166-75, *Veterans Benefits Administration: Audit of VA Regional Office's Appeals Management Processes* 2 (2012), *available at* http://www.va.gov/oig/pubs/VAOIG-10-03166-75.pdf.
[127] *DOD Report 2009*, *supra* note 49, at 6.
[128] *Uniform Crime Reports: Clearances*, FBI (2011), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/clearances.

cases reported to police in the United States never make it to court, reflecting high attrition rates at the prosecution stage as well.[129] As a result, only about 14% of rapes and sexual assaults reported to police eventually result in some kind of sexual-offense conviction (fewer result in conviction for the original sexual offense reported).[130] These grim statistics reflect the fact that "independent evidence of nonconsent (e.g., a third-party witness, physical injuries, weapon present)" is the form of evidence most important to authorities, next to the criminal history of the accused;[131] survivors who are unable to produce objective evidence of their rape are at a severe disadvantage in convincing police and prosecutors to pursue their cases.

There is no reason to believe that VA adjudicators are immune from these same biases. Factors affecting official distrust of civilian rape victims are also at play in the military context. For example, among police, prosecutors, courts, and juries, victims' "[c]redibility is enhanced when the offense is reported right away rather than some time later and when the accused is someone the victim has never met."[132] Military life makes both of these conditions difficult for MST survivors to meet: as discussed, rates of immediate reporting of military sexual assault are very low, and acquaintance rape is extremely prevalent in the military. The nature of military sexual assault will often trigger the kinds of adjudicator biases that are most damaging to survivors' claims.

---

[129] Kathleen Daly & Brigitte Bouhours, *Rape and Attrition in the Legal Process: A Comparative Analysis of Five Countries*, 39 Crime & Justice 565, 607 (2010).
[130] *Id.* at 598 tbl.5.
[131] *Id.* at 616; *see also id.* at 614 tbl.11, 615.
[132] *Id.* at 588.

C.    **Despite repeated amendments, VA's current rules for PTSD related to military sexual trauma still allow for biased exercises of adjudicators' discretion**

Previous VA attempts to help claimants suffering the disabling effects of sexual assault have not worked. Unsuccessful attempts by VA to focus adjudicators' attention on a spectrum of potentially corroborative evidence for MST-related claims date back decades. At congressional hearings in 2010, the Director for Compensation and Pension Service at the Veterans Benefits Administration testified that the "VA has been developing programs to monitor MST screening and treatment, providing staff with training on MST-related issues" since 1992.[133] VA recognized in 1996 that "[v]eterans claiming service connection for disability due to in-service personal trauma face unique problems documenting their claims."[134] This was the year that VA updated its *Adjudication Procedures Manual* to note that, due to the sensitive and personal nature of "personal assault," a category that includes sexual assault, service members frequently choose not to report their assaults, and survivors may struggle to produce supporting evidence. VA counseled adjudicators to request and evaluate "alternative sources for information," listing the sources that are now included in 8 C.F.R. § 3.304(f)(5).[135]

This policy change was ineffective. VAROs and the BVA continued to ignore the kinds of secondary sources specified in the Manual when adjudicating claims for MST-based PTSD and to dismiss such claims without giving veterans proper notification and a chance to present

---

[133] 2010 Congressional Hearing, *supra* note 30 (statement of Bradley G. Mayes, Director, Compensation and Pension Service, Veteran Benefits Administration), *available at* http://veterans.house.gov/witness-testimony/bradley-g-mayes-17.

[134] Patton v. W., 12 Vet. App. 272, 278 (1999) (citation omitted); *cf.* U.S. Dep't of Veterans Affairs, *M21-1MR Adjudication Procedures Manual Rewrite* IV.ii.1.D.17(a) (2011) [hereinafter *VA Adjudication Procedures Manual*] (current provision).

[135] *Patton*, 12 Vet. App. at 278 (citation omitted); *see also* Anglin v. W., 11 Vet. App. 361, 368 (1998), *aff'd*, 203 F.3d 1343 (Fed. Cir. 2000) (discussing entry of this language into the manual in 1996); *cf. VA Adjudication Procedures Manual*, *supra* note 134, IV.ii.1.D.17(n) (current provision).

relevant, corroborating evidence of their in-service stressors. In 1999, for example, the U.S.

Court of Appeals for Veterans Claims ("CAVC") rebuked the BVA for failing to abide by the

new provisions in the Manual. The CAVC reminded the Board that they could not ignore current

medical diagnoses, relevant post-service medical treatment, corroborating testimony from family

and colleagues, or evidence of the veteran's behavioral changes, all of which were present in the

case. The court insisted, not for the first time, that "[t]he BVA cannot ignore provisions of the

Manual M21–1 relating to PTSD that are favorable to a veteran when adjudicating that veteran's

claim."[136]

    Even though the CAVC considers the *Adjudication Procedures Manual*'s rules regarding

PTSD claims to be "the equivalent of [VA] [r]egulations,"[137] in 2002, VA chose to codify the

1996 Manual revisions in the Code of Federal Regulations. This was deemed "necessary to

ensure that VA does not deny such claims simply because the claimant did not realize that

certain types of evidence may be relevant to substantiate his or her claim."[138] This reflected VA's

concern that ROs and the BVA were not only failing to credit secondary evidence by veterans

with PTSD incident to MST, but also failing to help such claimants develop their claims.

    VA initiated the rule change in 2000 with a Notice of Proposed Rulemaking published in

the Federal Register.[139] That proposal elicited a comment (by an unidentified party) anticipating

the difficulties that military sexual trauma survivors would continue to face under the proposed

rule change. The commenter suggested that "given the nature of PTSD, a diagnostician's

---

[136] *Patton*, 12 Vet. App. at 282; *see also* R v. W., 11 Vet. App. 393, 399 (1998) (directing BVA on remand to consider and discuss claimant's corroborating evidence of her in-service rape in light of 1996 Manual updates).
[137] *Id.* at 277 (citations omitted).
[138] Post-Traumatic Stress Disorder Claims Based on Personal Assault, 67 Fed. Reg. 10,330, 10,330 (Mar. 7, 2002) (codified at 38 C.F.R. pt. 3) [hereinafter *PTSD Personal Assault Final Rule*].
[139] Post-Traumatic Stress Disorder Claims Based on Personal Assault, 65 Fed. Reg. 61,132 (Oct. 16, 2000) [hereinafter *PTSD Personal Assault Proposed Rule*].

acceptance of a veteran's account of the claimed in-service stressor should be probative and sufficient evidence that the claimed in-service stressor occurred." The comment also asserted that "a competent and credible diagnosis of PTSD due to personal assault during service [should] be accepted as proof of service connection in the absence of evidence to the contrary."[140] VA rejected this proposal. In doing so, it seemed to assume that the suggested presumption would not be necessary in cases of PTSD based on personal assault, for "[i]f . . . VA finds that a doctor's diagnosis of PTSD due to a personal assault is . . . 'competent and credible' and there is no evidence to the contrary in the record, in all likelihood, such an opinion would constitute competent medical evidence."[141] Adjudicators would presumably give this "competent medical evidence" substantial weight.

This has not been the case. In several of the cases discussed above, VA adjudicators ignored medical diagnoses of MST-related PTSD without finding those doctors incompetent or not credible—adjudicators simply refused to give weight to appropriate medical evidence. In 2010, the CAVC went further and ruled that post-service medical reports categorically could *not* be used to corroborate an in-service stressor for a veteran claiming PTSD resulting from sexual assault.[142] This provoked the U.S. Court of Appeals for the Federal Circuit to reverse the CAVC, holding that the CAVC had failed to interpret the agency regulations in light of their plain meaning. These regulations clearly require VA to consider post-service medical evaluations.[143]

On June 27, 2011, almost ten years after promulgating 38 C.F.R. § 3.304(f)(5), VA distributed a memorandum reinforcing that VAROs must accept secondary evidence to

---

[140] *PTSD Personal Assault Final Rule, supra* note 138, at 10,330.
[141] *Id.* at 10,331.
[142] Menegassi v. Shinseki, No. 08-1895, 2010 WL 672785, *3 (Vet. App. Feb. 26, 2010).
[143] Menegassi v. Shinseki, 638 F.3d 1379, 1382 (Fed. Cir. 2011).

corroborate the occurrence of in-service rapes, sexual assaults, and sexual harassment.[144] The memo also indicated that adjudicators would receive additional training on handling these claims. In a letter to the organization Equality Now dated November 20, 2012, VA promoted this training as sufficient to address concerns about the adequacy of compensation proceedings for veterans with claims of PTSD resulting from in-service sexual trauma. As proof, the letter noted that May 2012 saw "a 61-percent grant rate for PTSD and 58-percent grant rate for MST."[145] This single-month data report is encouraging, but unfortunately, the figures did not hold for the full year.[146]

Moreover, the letter fails to compare the grant rate for PTSD claims related to MST with the grant rate for PTSD claims related to combat experience, prisoner-of-war experience, or fear of hostile military or terrorist activity. This would be the more telling comparison because, as the letter admits, it is particularly difficult for a veteran to obtain evidence of three types of stressors: those related to MST, combat, and prisoner-of-war experiences.[147] (Though unmentioned in the letter, VA's regulations also recognize the difficulty of obtaining evidence of stressors related to "fear of hostile military or terrorist activity."[148]) In addition, one month's positive performance in decades of mistreatment and mistrust of veterans suffering mental health disorders as a result of MST does not resolve the issue. Problems persisted after VA issued a training letter to

---

[144] Allison A. Hickey, Under Sec'y of Veterans Affairs for Benefits, U.S. Dep't of Veterans Affairs, VBA Letter 20-11-23, *Military Sexual Trauma* (June 27, 2011) [hereinafter Hickey Memorandum], *available at* http://statesidelegal.org/sites/default/files/VBA%20Letter%20on%20MST%2020-11-23.pdf.

[145] Letter from Allison A. Hickey, Under Sec'y of Veterans Affairs for Benefits, U.S. Dep't of Veterans Affairs, to Lauren Hersh, N.Y. Dir., Equality Now (Nov. 20, 2012) [hereinafter Hickey Letter].

[146] See note 78 (noting that discrepancy in grant rates for PTSD claims and MST-related PTSD claims persisted in FY2011 and FY2012).

[147] *Id.*

[148] 38 C.F.R. § 3.304(f)(3) (2012).

adjudicators in 2005 reviewing the proper processing of MST-related PTSD claims.[149] There is no reason to believe that the long-term results will be different this time around.

The history of VA's attempts to create fair adjudicatory procedures for veterans with sexual trauma-related claims demonstrates that informal fixes are unlikely to fully protect claimants. VA has a long track record of holding veterans with PTSD claims stemming from MST to unreasonable and inconsistent standards of evidence in proving the occurrence of their in-service stressor. VA ignores the plain language of the regulations governing what evidence is acceptable. This practice has persisted in the face of numerous attempts at correction. It will continue so long as VA adjudicators are permitted to weigh survivors' secondary, post-service evidence against the absence of evidence from the time of their attack. It is time to shift the burden to produce positive evidence from survivors of in-service sexual assault to the government attempting to refute their claims.

## VI.   Proposed rule

SWAN and VVA petition VA to amend 38 C.F.R. § 3.304 by creating a new subsection—§ 3.304(g)—directly addressing MST. The proposed amendment reads as follows:

§ 3.304 Direct service connection; wartime and peacetime
. . .
(g) Military sexual trauma. If a stressor claimed by a veteran is related to the veteran's reported experience of military sexual trauma and a psychiatrist or psychologist confirms that the claimed stressor is adequate to support a diagnosis of a mental health condition and that the veteran's symptoms are related to the claimed stressor, in the absence of clear and convincing evidence to the contrary, the veteran's lay testimony alone may establish the occurrence of the claimed in-service stressor.

---

[149] *See* 2010 Congressional Hearing, *supra* note 30 (statement of Joy J. Ilem, Deputy National Legislative Director, Disabled American Veterans), *available at* http://veterans.house.gov/witness-testimony/joy-j-ilem-14; Inst. of Med., *PTSD Compensation*, *supra* note 27, at 193.

The proposed rule would help ensure that veterans who have experienced rape, sexual assault, and sexual harassment during service are able to access the resources they need. Under the current rule, the evidentiary burden for establishing the occurrence of military sexual trauma is often insurmountable. This problem can be remedied through recognition of the special circumstances surrounding MST-based claims and by liberalization of the evidentiary standards for MST survivors—solutions VA has used when confronted with other types of stressors, such as combat and prisoner-of-war experience, that are difficult to prove yet similarly linked to mental disabilities.

All veterans submitting a PTSD claim must prove the occurrence of the claimed stressor causing the PTSD. However, VA applies liberalized standards for proving the occurrence of the claimed stressor in five circumstances: (1) when the PTSD is diagnosed while the veteran is in service; (2) when PTSD is incurred as a result of combat experience; (3) when PTSD is incurred as a result of prisoner-of-war experience; (4) when PTSD results from fear of hostile military or terrorist activity; and (5) when PTSD results from personal assault.[150] VA applies its most liberal standard to PTSD claims related to combat and prisoner-of-war experiences. For these claims, if the veteran has been diagnosed with PTSD, the veteran's lay testimony alone may establish the occurrence of the stressor, so long as there is no "clear and convincing evidence to the contrary" and "the claimed stressor is consistent with the circumstances, conditions, or hardships of the veteran's service."[151] For PTSD claims related to fear of hostile military or terrorist activity, in addition to the requirements that apply to combat- and prisoner-of-war-related claims, a VA or

---

[150] 38 C.F.R. § 3.304(f) (2012). Beyond claims related to an in-service diagnosis, prisoner-of-war and combat experience, fear of hostile military or terrorist activity, and personal assault, there are no special regulations governing the evidence required to prove the existence of the in-service stressor for a PTSD claim.
[151] *Id.* §§ 3.304(f)(2), (4). This standard also applies to veteran whose PTSD is diagnosed during service and "the claimed stressor is related to that service." *Id.* § 3.304(f)(2).

VA-contracted psychiatrist or psychologist must confirm that "the claimed stressor is adequate to support a diagnosis of posttraumatic stress disorder and that the veteran's symptoms are related to the claimed stressor."[152]

Of the five specified categories of claims, PTSD claims related to personal assault, including rape, sexual assault, and sexual harassment, are subject to the highest evidentiary standards. In these cases, secondary evidence is permitted, but the lay testimony of the veteran alone, coupled with a diagnosis of PTSD, is *not* sufficient to establish the occurrence of the claimed stressor. In a November 20, 2012, letter to Equality Now, VA incorrectly equated the standard for PTSD claims based on personal assault with the other, more liberal standards. VA asserted that regulatory changes to allow veterans to more easily corroborate the occurrence of their in-service stressor were "unnecessary," because "MST-related PTSD claims . . . fall under a special category, with the same lowered evidentiary standard as that applied to combat or POW-related stressors."[153] VA acknowledged that, unlike the rules governing claims for combat or POW-related stressors, "the wording of this category does not specifically mention 'lay testimony,'" but then concluded that the standards for MST-related PTSD claims were identical, because *after the veteran had qualified for a medical exam*, VA could accept his or her lay testimony corroborating the occurrence of the in-service stressor (the sexual assault) without other, objective evidence.[154]

This characterization of the rule governing PTSD-claims related to military sexual trauma is misleading. VA requires veterans to present evidence "showing a minimal circumstantial indicator of the in-service MST event" before the veteran qualifies for a medical exam. VA

---

[152] *Id.* § 3.304(f)(3).
[153] Hickey Letter, *supra* note 145.
[154] *Id.*

44

asserts that the veteran's lay testimony can then be sufficient to prove the occurrence of the in-service stressor, "if accepted by the examiner and related to current PTSD symptoms."[155] VA argues that this burden is the same as that placed on upon veterans with PTSD related to combat or prisoner-of-war experience: "In claims based on combat or POW-related stressors, a threshold of evidence must be met showing actual combat or former POW experience. Once this threshold is met, the Veteran's lay testimony during the examination process can establish occurrence of the stressor."[156]

This is a false equivalence. To become entitled to a presumption of credibility, combat veterans must prove only that they served in general conditions in which stressors causing PTSD frequently occur. *They do not have to present any threshold evidence of the specific stressor.* A parallel rule for veterans claiming PTSD as a result of MST would require claimants to prove they served in general conditions in which military sexual assault and sexual harassment are known to occur. (Military sexual assault, unfortunately, is known to occur in all conditions of service, making this level of proof unnecessary in MST-related PTSD claims.) Instead, before their lay testimony can be accepted as sufficient evidence, veterans with PSTD resulting from in-service sexual assault must present "a minimal circumstantial indicator of *the in-service MST event*"[157]—in other words, they must show threshold evidence *of the specific stressor itself,* not merely evidence of conditions that are known to give rise to that stressor. VA thus requires veterans to present some non-testimonial proof of the occurrence of the in-service sexual before it will accept a veteran's testimony as proof of the assault. This circular reasoning often prevents survivors of MST from successfully advancing their claims before VA.

---

[155] *Id.*
[156] *Id.*
[157] *Id.*

Additionally, even if the veteran produces significant secondary evidence demonstrating the occurrence of sexual assault, "[t]here is currently no mandate to provide the veteran with a VA examination, and whether the lay evidence is sufficient to obtain an examination is a question left for adjudicators."[158] As noted in examples above, adjudicators often fail to order an examination even when the veteran's evidence meets the threshold triggering VA's duty to assist under the VCAA. This is another significant deviation from the rules governing the PTSD claims of combat veterans and former prisoners of war. Veterans in these categories only have to present a diagnosis of PTSD related to their claimed stressors. They do not have to present any threshold evidence proving their in-service stressor before the diagnosis is deemed credible, nor must they be diagnosed by a VA examiner.

The proposed rule would address the current burden faced by veterans with claims related to in-service sexual assault by incorporating the lay-testimony evidentiary standard used for claims related to fear of hostile military or terrorist activity. The stated rationales for the rule governing claims related to fear of hostile military or terrorist activity apply with equal force to claims related to military sexual trauma. First, as with previous amendments to rules governing proof of the in-service stressor causing PTSD, this amendment acknowledges the inherent difficulty of proving the occurrence of a particular kind of stressor. Second, the amendment is consistent with scientific studies of the relationship between mental disorders and the in-service stressor—in this case, sexual trauma. Third, the amendment will significantly alleviate administrative burdens on VA and will simplify training and supervision of adjudicators by reducing the number of specialized PTSD standards. The amendment will therefore help VA

---

[158] Ogilvie & Tamlyn, *supra* note 7, at 24; *see also* Bradford v. Nicholson, 20 Vet. App. 200, 207 (2006), *aff'd sub nom.* Bradford v. Peake, 272 F. App'x 884 (Fed. Cir. 2008) ("The language of the regulation leaves the decision to obtain such a professional opinion wholly within the discretion of the Secretary.").

expedite the claims process for all veterans. Finally, the amendment will lead to the more equitable resolution of mental-health related claims for disability compensation. The proposed amendment is necessary because VA practice shows that fair results cannot be achieved for veterans with mental disabilities related to in-service rape, sexual assault, and sexual harassment under the current regulatory conditions.

## A.      The proposed rule acknowledges the inherent difficulty of proving the occurrence of the stressor with secondary evidence

The proposed rule would reduce rejections of meritorious claims due to lack of documentation. Despite the widespread occurrence of in-service rape, sexual assault, and sexual harassment and the severity of its health effects, providing documentation for individual occurrences of military sexual trauma is extremely difficult. Indeed, when VA first proposed § 3.304(f)(5) in 2000, it acknowledged the difficulty of establishing the occurrence of the stressor: "Many incidents of in-service personal assault are not officially reported, and veterans may find it difficult to produce evidence to prove the occurrence of this type of stressor."[159] VA attempted to accommodate this difficulty by permitting veterans to submit secondary-source evidence in addition to their service records and contemporaneous medical records. Yet, even with the liberalized evidentiary standards of § 3.304(f)(5), veterans frequently cannot prove the occurrence of the stressor in cases of PTSD resulting from military sexual trauma. Simply editing the training materials to highlight these challenges will not resolve the fundamental difficulty of corroborating the stressor in these cases. As Michael MacDonald, Deputy Director

---

[159] *PTSD Personal Assault Proposed Rule, supra* note 139, at 61,132.

47

for VA Benefits, reported in 2009, lack of documentation is the primary obstacle to service-connected disability benefits for veterans claiming MST-related PTSD.[160]

The proposed solution is largely modeled on VA's 2010 rule for PTSD claims related to fear of hostile military or terrorist activity in § 3.304(f)(3). The 2010 rule change addressed evidentiary problems that systematically prevented certain kinds of PTSD-related disability claims from being granted, just like previous rule changes that liberalized evidentiary standards for proving the occurrence of an in-service stressor. In 1992, when VA proposed the rule allowing the lay testimony of combat veterans to serve as sufficient proof of their in-service stressor, VA acknowledged the existence of "specific circumstances where events can never be fully documented," making it impossible for veterans in those circumstances to provide evidence of stressors leading to PTSD.[161] "Combat," VA said, "is inherently life-threatening, and the brutal and horrific events associated with active armed combat are indisputably the types of stressful events that could produce PTSD. The chaotic circumstances of combat, however, preclude the maintenance of detailed records."[162] Similarly, in support of the 2010 rule change, attorneys at the BVA noted that the rise of "untraditional warfare" has created difficulties for non-combat veterans seeking service connection for PTSD, because this new, chaotic environment "does not lend itself to complete or accurate documentation of the often-times covert or random types of traumatic events that could serve as stressors and therefore lead to

---

[160] Jennifer C. Schingle, *A Disparate Impact on Female Veterans: The Unintended Consequences of Veterans Affairs Regulations Governing the Burdens of Proof for Post-Traumatic Stress Disorder Due to Combat and Military Sexual Trauma*, 16 Wm. & Mary J. Women & L. 155, 170 (2009).
[161] Direct Service Connection (Post-traumatic Stress Disorder), 57 Fed. Reg. 34,536, 34,536 (proposed Aug. 5, 1992) (codified at 38 C.F.R. pt. 3) [hereinafter *PTSD Combat Proposed Rule*].
[162] *Id.*

PTSD."[163] In response to concerns such as these, VA alleviated the evidentiary burdens required to prove the existence of in-service stressors for combat veterans, former prisoners of war, and veterans faced with fear of hostile military or terrorist activity.

Rape, along with war, was forefront in the minds of the "the framers of the original PTSD diagnosis" as a quintessentially traumatic experience likely to result in PTSD.[164] Rape, too, is a "brutal and horrific event[]" that occurs in "chaotic circumstances" and which "indisputably" may result in PTSD.[165] And as detailed previously, military rape and sexual assault are systematically under-documented, preventing survivors from producing detailed records of the stressor causing their PTSD. The proposed rule is necessary to ensure that PTSD claimants with diagnoses related to in-service sexual assault are treated with the same respect as other, similarly situated claimants. This change will significantly alleviate survivors' excruciating and traumatizing experiences at VA.

In addition, the proposed regulation will be fairer to victims of rape, sexual assault, and sexual harassment because it will be much more difficult for VARO adjudicators to misapply. By presuming that the in-service stressor occurred for veterans who have a valid diagnosis of PTSD incident to MST, the proposed rule removes discretion from the VAROs to deny these claims for lack of evidence when there is no reason to suspect the veteran's credibility. This will remove the heavy burden currently shouldered by sexual-trauma survivors and require the government instead to prove that the in-service stressor did not occur. Thus, the evidentiary and

---

[163] Nathaniel J. Doan & Barbara C. Morton, *A New Era for Establishing Service Connection for Posttraumatic Stress Disorder (PTSD): A Proposed Amendment to the Stressor Verification Requirement*, 2 Veterans L. Rev. 1, 10 (2010).
[164] Matthew J. Friedman, *A Brief History of the PTSD Diagnosis*, U.S. Dep't Veterans Affairs (Jan. 31, 2007), http://www.ptsd.va.gov/professional/pages/ptsd-overview.asp.
[165] *Cf. PTSD Combat Proposed Rule*, *supra* note 161, at 34,536.

personal biases that disfavor victims of sexual violence will factor much less into agency decisions.

## B. VA should accept diagnoses from licensed psychiatrists and psychologists when applying the proposed rule

The proposed rule is modeled on the rule governing PTSD claims related to fear of hostile military or terrorist activity. However, the proposed rule diverges from this model in one respect. The rule governing PTSD claims related to fear of hostile military or terrorist activity requires that a VA or VA-contracted psychiatrist or psychologist supply the PTSD diagnosis in order for the liberalized evidentiary standard to apply. The proposed rule rejects this criterion because the medical evidence does not support distinguishing between VA and VA-contracted psychiatrists or psychologists and other psychiatrists or psychologists for the purposes of diagnosing mental disorders in the veteran population. This distinction does not exist in the context of claims for PTSD related to combat or prisoner of war experiences, and it creates a barrier to care that should not be imported into a new rule regarding MST.

There is no justification for categorically distinguishing between VA and non-VA psychiatrists and psychologist for the purposes of the proposed rule. Psychiatrists and psychologists are medical professionals who are qualified to diagnose mental disorders in the veteran population. In 2011, the national organization Mental Health America evaluated the differences in diagnostic practices between VA and non-VA psychiatrists and psychologists for purposes of demonstrating PTSD under 38 C.F.R. § 3.304(f)(3). They concluded that "[n]o evidence in the professional literature or in our experience supports VA's assertion that its employed or contracted examiners are 'uniquely qualified' to perform PTSD examinations and to

provide forensic opinions necessary to decide PTSD clams."[166] The diagnostic guidelines for

VA, the American Psychiatric Association, and the American Academy of Psychiatry and the

Law are available online to all mental health professionals.[167] Both VA and non-VA psychiatrists

and psychologists may be given access to veterans' military service and medical histories. Both

VA and non-VA psychiatrists and psychologists are professionally obligated to provide accurate,

thorough, and consistent diagnoses. The VHA also acknowledges that all "[b]oard-certified

psychiatrists" and "[l]icensed doctoral-level psychologist[s]" are "qualified to perform initial

C&P examinations for mental disorders."[168] Permitting all psychiatrists and psychologists to

diagnose mental health conditions for purposes of the proposed rule will provide greater access

to care for veterans without lowering the quality of that care or the standards for benefits

approval.

---

[166] *See* Brief on Behalf of Mental Health America, Howard V. Zonana, M.D., and Madelon Baranoski, Ph.D., as Amici Curiae in Support of Petitioners at 8, Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs, 669 F.3d 1340 (Fed. Cir. 2012) (Nos. 2010-7136, -7139, -7142), 2011 WL 994249. This brief was prepared by the Veterans Legal Services Clinic at the Jerome N. Frank Legal Services Organization, which has also prepared this petition and which responds to the concerns raised by VA in Stressor Determinations for Posttraumatic Stress Disorder, 75 Fed. Reg. 39,843 (July 13, 2010) (codified at 38 C.F.R. pt. 3) [hereinafter *PTSD Fear Final Rule*].
[167] American Psychiatric Assoc., *Practice Guideline for the Treatment of Patients with Acute Stress Disorder and Posttraumatic Stress Disorder* 8-9 (2004), *available at* http://www.pbhcare.org/Guidelines/Guidelines/Blurb /Tree/Adult%20Mental%20Health/Acute%20Stress%20And%20PTSD/PTSD%20Algorithm.pdf); Liza H. Gold et al., *AAPL Practice Guideline for the Forensic Evaluation of Psychiatric Disability*, 36 J. Am. Acad. Psychiatry & L. (Supplement) S3 (2008), *available at* http://www.jaapl.org/cgi/reprint/36/Supplement_4/S3; Patricia Watson et al., Dep't of Veterans Affairs, *Best Practice Manual for Posttraumatic Stress Disorder (PTSD) Compensation and Pension Examinations* 13-22 (2000), *available at* http://www.avapl.org/pub/PTSD%20Manual%20final%206.pdf; Dep't of Veterans Affairs, *C&P Service Clinician's Guide* (2002), *available at* http://www.warms.vba.va.gov /21guides.html.
[168] Veterans Health Admin. Dep't of Veterans Affairs, VHA Directive 2012-021, *Qualifications for Examiners Performing Compensation and Pension (C&P) Mental Disorder Examinations* 2 (2012), *available at* http://www1.va.gov/vhapublications/ViewPublication.asp?pub_ID=2780.

## C. The proposed rule is consistent with the DSM-IV and current medical research

The suggested amendments are consistent with the DSM-IV and current medical research. Creating a new section in 38 C.F.R. § 3.304 for MST-related claims will facilitate VA's ability to update specifically associated diagnoses as medical research on MST and its long-term consequences develops. VA already emphasizes that military sexual trauma is best understood "as an experience, not a diagnosis or a mental health condition."[169] As DOD[170] and the Center for Disease Control[171] recognize, MST is a stressor that can lead to various mental disorders recognized by the DSM-IV, including, but not limited to, depression, PTSD, and substance abuse.[172]

Regarding PTSD in particular, the DSM-IV includes sexual assault as a traumatic event that can cause PTSD,[173] and the DSM-IV Guidebook explains that the criteria for PTSD were written specifically to apply to experiences of sexual assault.[174] Scientific studies of PTSD in the military context also underscore the high correlation between MST and PTSD. In *Gulf War and Health*, the Institute of Medicine ("IOM") analyzed "the long-term effects of deployment-related stress."[175] This is the same report that VA relied upon when formulating its proposed rule for 38

---

[169] VA, *MST Factsheet*, *supra* note 16, at 2.

[170] *DOD Report 2012*, *supra* note 11, at 97.

[171] *Sexual Violence: Data Sources*, Ctr. for Disease Control and Prevention, http://www.cdc.gov/violenceprevention /sexualviolence/datasources.html (last updated Apr. 6, 2010).

[172] Alina Suris & Lisa Lind, *Military Sexual Trauma: A Review of Prevalence and Associated Health Consequences in Veterans*, 9 Trauma, Violence, and Abuse 250, 265-269 (2008).

[173] Am. Psychiatric Ass'n, *The Diagnostic and Statistical Manual of Mental Disorders* § 309.81, at 424 (4th ed. 1994) [hereinafter DSM-IV].

[174] Michael B. First et al., *DSM-IV-TR Guidebook* 253 (2004) ("The phrase 'physical integrity' was included to ensure that all experiences of sexual assault would be covered, not just those in which the person perceives a threat to life or limb.").

[175] 6 Inst. of Med., *Gulf War and Health: Physiologic, Psychologic, and Psychosocial Effects of Deployment-Related Stress*, at xvii (2008) [hereinafter IOM, *Deployment-Related Stress*].

C.F.R. § 3.304(f)(3).[176] The conclusions of that report for MST are equally as striking. The IOM stated that "[s]exual assault and harassment are widely acknowledged stressors in the general population and are severe stressors when incurred in a war zone."[177] In fact, "[s]exual assault is one of the two leading risk factors (combat is the other) for PTSD. . . . Sexual assault, however, was a greater risk factor for PTSD than was combat exposure in both men and women."[178] These facts support the proposed rule's presumption of service connection for mental health conditions related to MST.

## D. The proposed rule will alleviate administrative burdens on VA and expedite claims for all veterans

The current process of applying for benefits is "complex, legalistic, and protracted."[179] By allowing a veteran to submit personal testimony regarding his or her in-service sexual assault, supported by a medical diagnosis linking the veteran's current disability with that experience, VA will improve the timely resolution of claims. VA's experience with liberalizing the evidentiary standard for claims based on stressors related to fear of hostile military or terrorist activity demonstrates that the new standards will increase consistency while minimizing delays.

When it executed the rule change reducing the evidentiary burdens on veterans seeking compensation for PTSD resulting from fear of hostile military or terrorist activity, VA refuted the assertions of commenters who worried that the amendment would increase adjudicatory delays. VA found the opposite, stating, "[W]e believe that this rule will improve the timeliness of

---

[176] *Stressor Determinations for Posttraumatic Stress Disorder*, 74 Fed. Reg. 42,617, 42,618 (proposed Aug. 24, 2009) (codified at 38 C.F.R. pt. 3).

[177] IOM, *Deployment-Related Stress, supra* note 175, at 37.

[178] *Id.* at 87.

[179] Inst. of Med., *PTSD Compensation, supra* note 27, at 122 (quoting Nina A. Sayer et al., *Post-Traumatic Stress Disorder Claims from the Viewpoint of Veterans Service Officers*, 170 Military Med. 867, 867 (2005)).

the adjudication of claims of all veterans by eliminating the need to search for corroborating evidence in certain cases."[180] The amendment eliminated the previous delays caused by verifying the PTSD stressor, which VA estimated affected 17.5 percent of claims for an average of 84 days.[181]

The same result can be expected of the proposed rule eliminating evidentiary burdens on survivors of military sexual trauma. These applicants for disability benefits can experience delays of up to four years in the resolution of their claims. The process often goes through several iterations at each level. After veterans initially file their claim, the VARO must help them develop their case. Veterans may take time to submit additional material after receiving notice of appropriate evidence from the VARO (if the VARO abides by its obligations under the VCAA). After a denial, veterans file a notice of disagreement. They are entitled to a hearing and then to an appeal to the BVA. Because VAROs often fail to appropriately develop and adjudicate claims based on military sexual trauma, the BVA frequently remands these cases. This lengthy process, which averages 4.25 years from the receipt of the notice of disagreement to the end of the remand process, has resulted in a tremendous backlog at VA that is expected to grow.[182] The BVA predicts that there will be increases in the number of appeals filed at the agency of original jurisdiction, in the number of cases received at BVA, and in the number of notices of disagreement received. Yet, the BVA predicts that there will be a decrease in the number of BVA decisions issued.[183]

---

[180] *PTSD Fear Final Rule*, *supra* note 166, at 39,845.

[181] U.S. Dep't Veterans Affairs, Office of Inspector Gen., No. 08-03156-227, *Audit of VA Regional Office Rating Claims Processing Exceeding 365 Days* 26 (2009), *available at* http://www.va.gov/oig/52/reports/2009/VAOIG-08-03156-227.pdf.

[182] *BVA Report 2011*, *supra* note 124, at 18.

[183] *Id.* at 17, 20, 23.

The BVA has outlined strategies to reduce the backlog, including eliminating avoidable remands, strengthening intra-agency partnerships, and writing clear and correct decisions.[184] Updating VA's rules to reflect the reality of military sexual assault is another crucial step in increasing efficiency in the administrative and legal process. The proposed rule alleviates the burden on VA to develop extensive and difficult-to-come-by corroborating evidence of a veteran's in-service sexual assault. With simplified evidentiary standards, VA will be able to process these claims more quickly and accurately, reducing delays at the VARO level and eliminating the need for many time-consuming and burdensome appeals and remands.

These simplified evidentiary standards will not increase costly fraudulent or frivolous claims. The proposed rule contains important safeguards against fraud, as did the 2010 rule easing evidentiary standards for claimants with PTSD as a result of fear of hostile military or terrorist activity. In defending the 2010 rule change against warnings of fraud, VA emphasized that "VA will not rely on a veteran's lay testimony alone to establish occurrence of the stressor"—instead, a qualified psychiatrist or psychologist must confirm the adequacy of the stressor to support a diagnosis of PTSD and the relationship of the veteran's PTSD to the stressor.[185] Similarly, the proposed amendment requires a medical diagnosis in conjunction with lay testimony to establish the link between the sexual trauma and the current disability. This will provide VA with an expert opinion that corroborates the occurrence of the stressor. In addition, the DSM-IV requires that "[m]alingering should be ruled out in those situations in which financial remuneration, benefit eligibility, and forensic determinations play a role."[186] As noted by the BVA's own lawyers, clinicians are more able to "detect malingering upon examination"

---

[184] *Id.* at 6-7.
[185] *PTSD Fear Final Rule*, *supra* note 166, at 39,845.
[186] DSM-IV, *supra* note 173, § 309.81, at 427.

than are adjudicators who must "read between the lines in a paper file,"[187] supporting a rule that gives greater weight to physicians' medical findings than to adjudicators' hunches.

Two other important protections remain, one inherent to VA's system of adjudication and the other common to MST-based claims. First, VA retains the final decisionmaking authority by reviewing all evidence subject to a clear and convincing standard. This standard ensures that while a veteran may rely on more types of evidence, the evidence itself must nonetheless meet a threshold of credibility. Second, the sensitive nature of MST itself makes fraudulent claims unlikely.[188] DOD itself characterizes the claim that people often falsely report sexual assault as a "[c]ommonly accepted myth[]," reporting instead that "[i]n fact, estimates for false reports range from 2 to 8 percent, similar to other felonies."[189] VA will not see its administrative savings in the timely adjudication of claims eroded by an increase in false reporting of MST-related PTSD.

**E.      The proposed rule will improve the consistency and equitable resolution of military sexual trauma claims**

The proposed rule would also encourage consistent decision-making. Dr. Betty Moseley-Brown, Associate Director for VA Center for Women Veterans, has spoken out about the difficult process for veterans seeking compensation for MST-related disabilities and the ways in which liberalizing the evidentiary standards would improve that process. As Dr. Moseley-Brown explained, MST-related mental disorders have varying symptoms. Even for a particular diagnosis, such as PTSD, the symptoms can be obvious in some cases and subtle or ambiguous in others. This has led claims adjudicators to apply oversimplified or subjective criteria, which in

---

[187] Ogilvie & Tamlyn, *supra* note 7, at 38.
[188] Schingle, *supra* note 160, at 173.
[189] *DOD Report 2009*, *supra* note 49, at 6.

56

turn has led to inconsistent results.[190] Recognizing ongoing problems with the application of existing evidentiary standards, in June 2011, VA sent a letter of guidance for officials handling MST-based claims, "reiterating that all claims examiners must apply proper flexibility and sensitivity in evaluating evidence of service connection in these cases."[191] The inherent mismatch between the evidence likely to be available and the evidence required, however, ensures that inconsistency will be an ongoing problem under the current rule.[192]

Finally, the proposed rule would help ensure the equitable resolution of claims. When VA faced an analogous problem regarding fear-based PTSD, it implemented a rule similar to this proposal. As Belinda J. Finn, Assistant Inspector General for Audits and Evaluations at VA's Office of Inspector General, testified before Congress, "This change significantly reduced processing errors associated with PTSD claims."[193] That rule helped reduce the error rate associated with PTSD claims processing from 13% to 5%.[194] This error rate may not perfectly mirror that of denials of PTSD claims related to MST. However, it does demonstrate that adjusting the evidentiary burden to account for the circumstances of the stressor can increase fair and accurate claims processing. The implementation of this rule was also accompanied by a significant increase in VARO compliance with VA policy regarding PTSD claims.[195]

---

[190] Schingle, *supra* note 160, at 172.

[191] Hickey Memorandum, *supra* note 144, at 1.

[192] Inst. of Med., *PTSD Compensation*, *supra* note 27, at 23.

[193] *An Examination of Poorly Performing U.S. Department of Veterans Affairs Regional Offices: Hearing Before the Subcomm. on Disability Assistance and Mem'l Affairs of the H. Comm. on Veterans' Affairs*, 112th Cong. (2011) (statement of Belinda J. Finn), *available at* http://www.gpo.gov/fdsys/pkg/CHRG-112hhrg67191/html/CHRG-112hhrg67191.htm.

[194] U.S. Dep't Veterans Affairs, Office of Inspector Gen., No. 11-00510-167, *Systematic Issues Reported During Inspections at VA Regional Offices* 6 (2011).

[195] *Reclaiming the Process: Examining the VBA Claims Transformation Plan as a Means to Effectively Serve Our Veterans: Hearing Before the H. Comm. on Veterans' Affairs*, 112th Cong. (2012) (statement of Linda A. Halliday), *available at* http://veterans.house.gov/witness-testimony/ms-linda-halliday.

Furthermore, under the current system, adjudicators deny claims by female veterans for service-connection for PTSD at greater rates than claims by male veterans. The VA Inspector General estimated in 2010 that VA denied 49.8% of women's claims for service-connected disability compensation for PTSD, but only 37.7% of men's claims.[196] Yet, a study by the RAND Corporation found that female veterans suffer PTSD at twice the rate of male veterans.[197] The Inspector General traces this disparity in part to the fact that service connection for PTSD caused by combat is very easy to prove, and VA is much more likely to presume that men experienced combat than that women did.[198] Currently, PTSD related to MST and PTSD related to combat share similar evidentiary difficulties, yet the rules apply different evidentiary standards. Because the majority of MST-related PTSD claims are filed by women and the majority of combat-related PTSD claims are filed by men, the current rules result in women's PTSD claims being disproportionately rejected.[199] The proposed rule eliminates the barriers that women in particular face at VA and in doing so eliminates disparate treatment of women and men.

## VII. Conclusion

For decades, DOD and VA have been aware that sexual assault in the military is pervasive and that survivors are highly likely to suffer from PTSD as a consequence. Proposed legislation, military reports, congressional hearings, documentaries, media publications, and

---

[196] *Review of Combat Stress in Women Veterans*, *supra* note 6, at 65. For a discussion of recent statistics on grant rates for MST-related PTSD claims, which may affect the grant rates for women versus men, see *supra* note 145 and accompanying text.

[197] Benedict, *supra* note 98.

[198] *Review of Combat Stress in Women Veterans*, *supra* note 6, at 64.

[199] The IOM notes, "What information is available suggests that female veterans are less likely to receive service connection for PTSD and that this is a con-sequence of the relative difficulty of substantiating exposure to noncombat traumatic stressors—notably, MSA [military sexual assault]." Inst. of Med., *PTSD Compensation*, *supra* note 27, at 193.

public petitions have shed light on this ongoing epidemic. While important reforms are taking place, much damage has already been done to the men and women who serve this country.

Already betrayed once by their fellow service members, veteran survivors of military sexual trauma now face an uphill battle against disbelieving VARO claims officers. Every VA justification for a lower evidentiary standard in other contexts applies with equal or greater force to the circumstances surrounding military sexual assault and sexual harassment. Furthermore, allowing veteran survivors of MST to establish the existence of the stressor through their lay testimony, supported by a medical diagnosis, would reduce onerous delays in the process, allow for more reliable and accurate VARO determinations, and would not impose significant administrative burdens or costs. It is past time for VA to amend its rules to allow veterans who suffer disabilities related to military sexual trauma access to the liberalized evidentiary standards provided to veterans who experience combat, prisoner-of-war status, and fear of hostile military or terrorist activity. The way forward is clear.

# The Jerome N. Frank Legal Services Organization

April 29, 2014

Clerk of Court
US Court of Appeals for the Federal Circuit
717 Madison Place, NW
Room 401
Washington, DC 20439

**RECEIVED**

Re: Docketing Materials for SWAN and VVA's Petition for Review

APR 3 0 2014

Dear Clerk,

**United** States Court of Appeals
**For The** Federal Circuit

This mailing includes case-initiating documents, including:

- Original signed Petition for Review
- 3 copies of the Petition for Review
- Check for $500 Docketing Fee

Please do not hesitate to contact me if there is anything else you need in order to docket this case.

Sincerely,

Joya Sonnenfeldt
*Law Student Intern*
Joya.sonnenfeldt@clinics.yale.edu
(917) 620 - 8144